**ROSENTHAL et al. v. SUN CO. et al.**

(Court of Civil Appeals of Texas. El Paso. April 3, 1913. Rehearing Denied May 1, 1913.)

1. EVIDENCE (§ 386*)—PAROL EVIDENCE—DECREE.

Where the calls in a partition decree, supported by a map expressly made a part thereof, are unambiguous, extrinsic evidence that the survey occupied some other position was inadmissible.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1678–1697; Dec. Dig. § 386.*]

2. BOUNDARIES (§ 40*)—LOCATION—QUESTION FOR JURY.

In trespass to try title involving the location of a boundary between a tract set apart by a partition decree and the adjacent tract, the question of the location of the boundary *held* for the jury under the evidence.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 196–204; Dec. Dig. § 40.*]

3. BOUNDARIES (§ 3*) — CALLS — BEGINNING CORNER.

The beginning corner of a survey is not usually of any more importance in determining the location of the survey than any other corner therein.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 3–41; Dec. Dig. § 3.*]

4. BOUNDARIES (§ 40*)—QUESTIONS FOR JURY—LAYING OUT AND PLATTING LANDS.

Where the laying out and platting of lands into subdivisions is one piece of work, but there is uncertainty as to the location, the question is for the jury.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 196–204; Dec. Dig. § 40.*]

5. APPEAL AND ERROR (§ 837*)—HARMLESS ERROR—INSTRUCTIONS.

The court on appeal, to determine whether a charge complained of was erroneous, must determine what issues involved were necessary to be passed on to enable the trial court to render a proper judgment.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3262–3272, 3274–3277, 3289; Dec. Dig. § 837.*]

6. PARTITION (§ 95*)—DECREE—CONSTRUCTION—INTENTION OF COURT.

A partition by decree of court is the act of the court, and its intention governs.

[Ed. Note.—For other cases, see Partition, Cent. Dig. §§ 300–316; Dec. Dig. § 95.*]

7. PARTITION (§ 95*)—DECREE—CONSTRUCTION.

Where a plat, made part of the report of commissioners in partition and of the decree, covered all the land intended to be partitioned, but the field notes in the report did not do so, the question was as to the intent of the commissioners in their report and the court's intention in its adoption by decree.

[Ed. Note.—For other cases, see Partition, Cent. Dig. §§ 300–316; Dec. Dig. § 95.*]

8. APPEAL AND ERROR (§ 1064*)—HARMLESS ERROR—ERRONEOUS INSTRUCTIONS.

Where there are two grounds on which the successful party may properly recover on a finding by the jury in his favor, and the court on appeal does not know whether the first was controlling, it will not set aside the judgment for error in an instruction thereon.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4219, 4221–4224; Dec. Dig. § 1064;* Trial, Cent. Dig. §§ 475, 525.]

Appeal from District Court, Harris County; Norman G. Kittrell, Judge.

Action by Morris Rosenthal and others against the Sun Company and others. From a judgment for defendants, plaintiffs appeal. Affirmed.

Presley K. Ewing, A. L. Jackson, John B. Warren, H. J. Dannenbaum, and Fisher, Sears & Sears, all of Houston, for appellants. S. H. Brashear and Carlton, Townes & Townes, all of Houston, and Greer & Minor, of Beaumont, for appellees.

HARPER, C. J. This was an action in the form and with the averments of trespass to try title, by Morris Rosenthal, William Sporn, Rannie Mooney, joined by her husband, J. E. Mooney, Susan West, joined by her husband, Fred R. West, Brack Hargrave, and the minors, Urilder, Nobles, and Wilson Hargrave, by their guardian, Clementine E. Majorowitz, suing as or in the right of the heirs of Mary Hargrave, deceased, against the Sun Company, J. R. West, and C. H. Howard, to recover a strip of land 90 feet wide off of and across the north end of a tract of 39.304 acres out of the James Strange survey in Harris county, allotted to the children of Mary Hargrave (hereinafter called the Hargrave tract), by the district court of Harris county, on January 22, 1894, in cause No. 14,271, entitled Geo. H. Hermann v. W. T. Payne et al. (hereinafter called the Hermann-Payne partition suit).

Plaintiffs alleged that there was, after said Hermann-Payne partition suit, a partition among the owners of said Hargrave tract, in cause No. 34,907, in the district court of Harris county, entitled Mary Elzina West et al. v. Brack Hargrave (hereinafter called West-Hargrave partition suit), and that thereunder, by one Ehrhardt, as surveyor appointed by the court, a purported subdivision of said tract had been made, supposed to cover all of it, and that said 90-foot strip comprised parts of certain lots of such subdivision, to wit, lots 1 and 5 in block 1, and lot 1 in block 2, owned by plaintiff Rosenthal, and lot 3 in block 1, owned by Susan West, and lot 4 in block 1, owned by Rannie Mooney, and lot 6 in block 1, owned by Edgar W. Hargrave and William Sporn, and lot 6 in block 2, owned by Edgar W. Hargrave, and lot 7 in block 1,

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

and lot 7 in block 2, owned by Brack Hargrave, and lot 2 in block 2, owned by Urilder, Nobles, and Wilson Hargrave, but that if mistaken in the averment that said lots were in said 90-foot strip, nevertheless plaintiffs were the owners in fee simple of the 90-foot strip, and of said subdivisional lots, both of which were a part of said Hargrave tract. Plaintiffs further alleged that plaintiffs (except Edgar W. Hargrave and William Sporn, as to the lot 6 in block 1) had pooled their interests in said Hargrave tract for oil purposes, and had executed to the plaintiff Morris Rosenthal an oil lease thereof, with power to sublease, reserving a tenth of the oil as royalty; and that said Rosenthal, in the exercise of his power of subleasing, executed to defendant Sun Company on January 23, 1908, an oil lease on said lots 1, 3, 4, 5, and 7 in block 1, and said lots 1, 2, and 7 in block 2 of said Hargraves subdivision, reserving one-sixth of the oil product as royalty. It was alleged that E. W. Hargrave and William Sporn, as to said lot 6 in block 1, executed an oil lease thereof to Oran West, with power to sublease and assign, reserving an eighth part of the oil as royalty, and that afterwards Oran West assigned and sublet the same to W. S. Farish, reserving a sixth royalty of the oil produced, and that subsequently, on January 20, 1910, said Farish duly assigned all his rights to the oil that had been or might thereafter be produced or taken from said lot 6 in block 1, under such lease, to plaintiff Morris Rosenthal. Plaintiffs further alleged that the defendant the Sun Company, aided and assisted by its codefendants, had extracted from said 90-foot strip, and from the north 90 feet of said subdivisional lot 6 in block 1, to wit, 240,000 barrels of oil, of the reasonable market value of $192,000, all of which it had wrongfully appropriated and converted to its own use, and had also extracted from the north 90 feet of said lots 1, 3, 4, 5, and 7 in block 1, and said lots 1, 2, and 7 in block 2, of said Hargrave subdivision, to wit, 210,000 barrels of oil, of the reasonable and market value of 80 cents per barrel, for one-sixth of which it became and was accountable to plaintiff Morris Rosenthal, for the use of himself and coplaintiffs, but that it had wrongfully appropriated and converted same to its sole and exclusive use and benefit, including plaintiffs' one-sixth royalty, of the reasonable and market value of $28,000, for which it has refused to account to plaintiffs, notwithstanding due demand, basing its refusal upon the adverse claim that the wells from which such oils were produced are not on said lots covered by said lease to it. Plaintiffs further alleged that under their pooling agreement they had apportioned and assigned among themselves their interest in the recovery, so that the recovery by any would be for the benefit of all, without issue between them,

and recovery by all for the benefit of each, likewise without issue between them. Plaintiffs prayed for the title and possession of said 90-foot strip, and for their damages for the oil taken out by defendants without right, and for recovery of their royalties on the oil taken out under said lease to defendant, and for costs and general relief.

The answer of the defendant Sun Company, so far as necessary to notice, set up, in connection with the plea of not guilty and general denial, as follows: (1) That plaintiffs' action was barred by two years' limitation for oil taken out prior to July 28, 1911, the date of the filing of the plaintiffs' second amended original petition, upon which the trial was had. (2) That the lease to it from Morris Rosenthal was delivered and accepted as alleged by plaintiffs, but that the 90-foot strip was cut off of and across the south end of a tract of 39⅓ acres allotted to J. D. Bourgeois in said Hermann-Payne partition suit, and that it had an oil lease thereon from the owners, W. H. Bailey, J. R. West, Geo. L. Glass and Eugene W. Booth, to whom it had paid the royalties, both before and since the instant suit, and they were impleaded for recovery over by cross-action, if it was cast. (3) That whether the true division line placed the 90-foot strip in the J. D. Bourgeois or in the Hargrave tract, the respective owners had agreed upon a boundary line between said tracts, so as to place said 90-foot strip in the J. D. Bourgeois. (4) That plaintiffs were estopped to claim the 90-foot strip to be a part of the Hargrave tract, for the reason that they, or those under whom they claim, had by said Ehrhardt plot of the Hargrave, and deeds and releases adopting and recognizing it, or by pointing out the line on the ground, or by other acts or statements, represented the dividing line to be where it, the Sun Company, claims it to be, that is, so as to put the strip in question in the J. D. Bourgeois tract, south of the wells in dispute, and that on the faith of such representations it had been reasonably misled into changing its position for the worse at great outlay, by drilling wells and paying over royalties to claimants of the J. D. Bourgeois tract.

The impleaded defendant, J. R. West, died pending the suit, and on petition by plaintiffs, his heirs and representatives were brought in, to wit, his administratrix, Isabella West, and his minor children, Emmett, James R., and Sam West, and Edna Wilson, an adopted daughter.

The impleaded cross-defendants, including the heirs and representatives of J. R. West, deceased, the minors, by their regularly appointed guardian ad litem, S. H. Brashear, duly answered practically to the same effect as the defendant the Sun Company.

The plaintiffs, under leave of the court, filed a supplemental petition in reply, in which

they, after interposing a general denial to the averments of the answers, alleged:

"That in the alleged Hermann-Payne partition suit, under which both sides claim, the surveyor merely ran the outer lines of the alleged Strange survey, and meandered the San Jacinto river, then located the M. Bourgeois, the M. Boudreau, the J. D. Bourgeois, and Mary Hargrave tracts in their order, by course and distance, tying each to the other without running the lines on the ground, and conforming the location of the Dunman 150-acre tract called for to such course and distance; and, by locating said tracts in the manner and by the course and distance as done by said surveyor, the true boundary line between the J. D. Bourgeois and Hargrave tracts is north of the wells in question, where the plaintiffs claim it to be.

"That there never was any agreement between the respective owners of said J. D. Bourgeois and Mary Hargrave tracts, as held under said Hermann-Payne partition suit, fixing the boundary line between them at any point different from the true boundary line as above stated.

"That, as concerns the claim by defendants of estoppel based on acts or conduct of plaintiffs, or those under whom they hold, arising from instruments placed of record, or from pointing out of the dividing line, the only color therefor comes from a plat and subdivision of the Hargrave tract made by the surveyor Ehrhardt, who was appointed by the court in the alleged West-Hargrave partition suit to partition the whole of such tract, which subdivision the defendants claim puts the boundary line between the J. D. Bourgeois and Hargrave tracts south of the wells in question. But, in this connection, the facts are that the Hargrave heirs never authorized said surveyor to subdivide less than the whole of said tract, or to place said dividing line at other than its true boundary, and they were unaware that he had done so, if he had, until about or after the commencement of this suit; that the defendants, and each of them, had equal means and opportunity of knowing the true boundary line between said tracts, and the acts and conduct of plaintiffs, and those under whom they claim, in respect to such subdivision and plat, or any recognition of same, would not have been taken by a reasonable person situated as were the defendants, or any of them, that the true boundary between such tracts was, or was recognized by plaintiffs as, south of said wells, or that plaintiffs, or those under whom they hold would set up no claim to the Hargrave tract as north of such line, and plaintiffs, and those under whom they hold and claim, had no reasonable grounds to anticipate that one in the situation of the defendants, or any of them, would, on the faith of such acts or conduct on the part of plaintiffs or those under whom they claim, treat the true boundary line as south of the wells in question, and on that assumption change their position to their pecuniary harm or prejudicially, as claimed, without taking proper steps to ascertain the true whereabouts of such boundary for themselves.

"That, as concerns the claim that plaintiffs were estopped by standing by in silence while the wells were being drilled and the royalties paid over, the facts are that plaintiffs were unaware, during such time, that the boundary line, which it is claimed was being acted on, was not the true one, and further during all such time, the defendants, and particularly the Sun Company, had equal and superior means and opportunity to ascertain the true boundary line.

"That, in point of fact, the defendant the Sun Company, in drilling the wells and paying over the royalties, acted on its own independent judgment, and not on account of anything said or done, or fraudulently concealed by the plaintiffs, or those under whom they hold, or any of them.

"That if the plaintiffs, and those under whom they claim, have, by acts or conduct, recognized a line south of said wells as being the true line, or if there was any such subdivision or plat, such was by mistake, and arose out of the error of uniting the Hargrave tract on the south with the Steele tract, which by mistake and error stopped 90 feet short; but, as concerns any agreement or estoppel between the owners of the Hargrave and Steele tracts, giving the Hargrave tract more than it is entitled to by 90 feet on its south, the owners or claimants of the J. D. Bourgeois were not parties thereto, nor are they in privity therewith, and such are not binding for or against them, and cannot affect the location of the true boundary on the north between the Hargrave and J. D. Bourgeois tracts, whatever gain might thereby go to the Hargrave."

The defendant Sun Company filed a first supplemental answer in rejoinder, practically reiterating the averments of its defenses as above set out.

A trial by a jury resulted in a verdict and judgment for the defendant, against which plaintiffs duly filed their motion for new trial, presenting the points of error herein relied on, which motion was overruled, and thereupon plaintiffs duly perfected their appeal by notice and bond, as required, and regularly assigned errors.

By a decree entered in the district court of Harris county January 22, 1894, confirming a report of commissioners, a large body of land was partitioned among a number of claimants. This dispute arises as to the boundary of two of the parcels set apart in severalty in the decree, and therefore, while brought in form of trespass to try title, in fact involves the true location of the boundary line between the J. D. Bourgeois subdivision and that set apart by the partition

decree to the children of Mary Hargrave.

The said partition suit (Hermann-Payne) by which the court allotted to the parties thereto parts of the James Strange and J. B. Jones surveys and the J. Dunman labor is the common source of title. The three surveys are bounded on the north by the San Jacinto river; the J. Dunman labor lies west of the James Strange and east of the part of the Strange there partitioned. Out of that survey is a tract of 432 acres, extending the surveys full length to the river on the north, and known as the Wilson 432-acre tract. The decree of partition reads:

"On this 22d day of January, 1894, came on to be heard the report of commissioners, * * * which said report, field notes and map, are as follows: Now comes T. W. Archer and P. S. Humble, two of the commissioners, * * * and having had said lands surveyed and platted by J. J. Gillespie, * * * have made and do make this, our report: We have allotted and set apart to W. T. Payne 152.91 acres, with improvements thereon. * * * We attach field notes and metes and bounds of each part allotted to each party in said cause, also a map showing a plat of all said lands, and the parts set apart to each.

"Field notes of a survey of 108.614 acres of land made for M. Bourgeois off the north end of the Strange survey: Beginning at the northeast corner of the J. Dunman labor on the south bank of the San Jacinto river, the same being the northwest corner of this survey; thence south 751.5 varas to corner; thence west 673 varas to corner on the west line of the Wilson 483-acre tract; thence north 269.3 varas to the San Jacinto river; thence up said river with its meanders to the place of beginning.

"Field notes of 23.07 acres made for the heirs of M. Boudreau out of the Strange survey, south of and adjoining 108.614 acres made for M. Bourgeois: Beginning at said Bourgeois' southwest corner; thence south 191 varas to corner; thence east 673 varas to corner; thence north 191 varas to M. Boudgrois southeast corner; thence west 673 varas to the place of beginning.

"Field notes of a survey of 39.304 acres made for J. D. Bourgeois out of the Strange survey, south of and adjoining the 23.07 acres made for the heirs of M. Boudreau: Beginning at the southwest corner of a survey of 23.07 acres made for Boudreau; thence south 329.6 varas; thence east 673 varas; thence north 329.6 varas; thence west 673 varas to the place of beginning.

"Field notes of a survey of 39.304 acres of land made for the children of Mary Hargrave out of the Strange survey, south of and adjoining the J. D. Bourgeois 39.304 acres: Beginning at the southwest corner of J. D. Bourgeois 39.304-acre tract; thence south 632.7 varas; thence east 209 varas to the west line of the Dunman 150 acres;

thence north 439.7 varas to the northwest corner of said 150-acre tract; thence east 464 varas; thence north 193 varas; thence west 673 varas to the place of beginning.

"Field notes of a survey of 39.304 acres out of the Strange and Dunman labor surveys made for (Mary Steele et al.) south of and adjoining a survey of 39.304 acres made for Mary Hargrave et al.: Beginning at southeast corner; thence south 567.2 varas to W. T. Payne's northeast corner; thence west 391.2 varas along said Payne's north line to corner; thence north 567.2 varas; thence east 391.2 varas to the place of beginning.

"Field notes of a survey of 151.91 acres of land made for W. T. Payne out of .the J. Strange, J. B. Jones surveys, and the J. Dunman labor: Beginning at a stake at the tram on the west line of the J. Dunman 150-acre survey 1,110 varas north of its southwest corner and 255 varas north and 209 varas east of the J. Dunman labor southeast corner; thence *east* 1,266 varas to the *west* line of the Holmes 50-acre tract; thence south 682 varas; thence east 1,266 varas to stake; thence north 682 varas to the place of beginning."

J. W. Gillespie testified as follows of the way the field notes and map adopted were arrived at: "J. J. Gillespie was my father. I assisted him in making the surveys. We went upon the ground; first we run the east line of the Strange, which was the east line of the Wilson, and then the east line of the balance of the Strange which was the west line of the Wilson 480 acres. We extended it then from the south line of the Strange to the river, the north line of the Strange. I could not tell now just exactly what we took up next after we run that line. The only one of the tracts in the report of the commissioners that we surveyed and actually located on the ground was the Payne; and in fixing this northeast corner of the Payne we began by measuring 1,110 varas from the southwest corner of the Dunman 150 as pointed out to us by an old settler by the name of Joe Dunman. I saw that the northeast corner was 1,110 varas north of the southeast corner of the Dunman 150 and 255 varas north and 209 varas east of the southeast corner Dunman labor. We then tied to these two surveys. We then surveyed the Payne tract and fixed the four corners. (Note from this description it appears there are two 'east' calls and no 'west.') I began at the northeast corner of the Strange and ran down 5,645 varas to southeast corner. I meandered some of the San Jacinto river, meandered across the Wilson tract, but just how much I do not now remember. I knew or thought I knew where the southwest corner of the Dunman labor was, and from that I located the intervening surveys between the Payne tract and the San Jacinto river. The call was 2,727 varas from the Dunman corner to the river, and I knew that the north line of the Payne was 255 varas north

of the south line of the Dunman, so had the difference to work on in reaching the river from the Payne. In making the field notes I think we began both ways, i. e., at the river and going south to the Payne, and at the Payne and north to the river. The notes will show the way it was done, and they will show the way they were made. There are not any of those blazed trees there now that are called for in the patent for corners of either the Strange or Dunman. It's hard to tell what is understood by a call for the bank of the river. In this case we intended that corner to be 2,727 varas north of the south line of the Dunman labor. I did not intend to start at any point different from the northeast corner of the Dunman and the northeast corner of the Strange, which I was ordered by the court to survey. The Payne tract cuts off a portion of the south of the Dunman labor, 255 varas north and south. If you subtract that from the 2,727 varas, you will have 2,472 left of the east line of the Dunman labor; add 567.2 varas for the Steele, 632.7 varas for the Mary Hargrave, 329.6 varas for the J. D. Bourgeois, the 191 varas for the M. Boudreau, and the 751.5 varas for the M. Bourgeois; they exactly correspond with the land I had left after I fixed the Payne. I intended to slice that land between the Payne and the river by a line running east and west and give those distances to each tract, just as I would a cake. If I take the Payne tract as a basis and give the Steele tract the distance shown in my plat and field notes and likewise the other surveys named to the river north, then the 90-foot strip will not be on the Hargrave. The northeast corner is a good high bank—clay—and has not varied for many years. I went to that corner when I made the partition. I know the 90-foot strip. If you take the measurements on the east side from this high bank corner, and give each tract its quantity called for on the map and in the field notes filed, the 90-foot strip will be on the Hargrave tract; and then if you run on around and north up the east line of the Dunman and the west line of the tracts in controversy, and give each tract its west line measurement according to the field notes of the partition decree, you would stop about 350 to 400 feet south of the water in the river."

Appellants' first assignment of error raises the point that as a matter of law the court should have instructed a verdict for the plaintiffs, first, because "the undisputed evidence showed that by properly locating the M. Bourgeois, by its calls in the Hermann-Payne partition suit, and tying thereto in their order by course and distance the Boudreau, the J. D. Bourgeois, and the Hargrave tracts, as required to be done, the 90-foot strip would be in the Hargrave tract."

[1] Of course, if the calls in the partition decree, supported by the map which is expressly made a part thereof, give rise to no ambiguity, extrinsic evidence cannot be resorted to to show that the survey occupied some other position. Warren v. Sapp, 97 S. W. 125; Johnson v. Archibald, 78 Tex. 96, 14 S. W. 266, 22 Am. St. Rep. 27.

[2] It is admitted that if the land be platted to the south, beginning with what plaintiffs claim was a fixed northeast corner of the M. Bourgeois 108-acre tract, the 90-foot strip would be where appellants claim it to be; if it should be platted to the north, with the Payne north line as a base, the 90-foot strip would be where appellees claim it to be. The question under the above assignment then is: Was there any inconsistency or ambiguity, such as under the law would require the cause to be submitted to the jury? The partition was the act of the court through the commission appointed. It is undisputed that the map and field notes when sought to be applied to the land as it actually measures out would not fit it. There was nothing said in the report about marked. lines, but simply described the several subdivisions by metes and bounds after naming. a beginning corner, to wit, the Dunman northeast corner, without locating it by any natural or artificial object except to say "on the bank of the San Jacinto river." The field notes would indicate that the several subdivisions as reported by the commission began at the M. Bourgeois 108-acre tract on the river and each in their order tacked to it, but the surveyor who was on the ground and who made the field notes testified, without objection, that he did not survey any of the subdivisions but did run some of the lines. of adjoining surveys as above noted; that he first located the Payne tract, and then calculated the distance between that and the Dunman corner, and in making the field notes intended to cut the space up between the Payne north to the river like he would a cake, giving so many varas north and south to the Steele, the Hargrave, the Bourgeois, the Boudreau, and the M. Bourgeois. The calculations and field notes were made in the office, all based upon the Payne tract.

The evidence further shows that the field notes without the plat (the plat or map was a part of the decree of the court and expressly mentioned therein as a part [Lyon v. Waggoner, 37 Tex. Civ. App. 205, 83 S. W. 46]) will not cover the ground intended to be partitioned by the court—a 90-foot strip unassigned—and if we measure from named corners either the northwest or northeast corner of the M. Bourgeois 108 on the river and then give each subdivision its number of varas south until we take up the space called: for, there is left a 90-foot strip north of the. Steele, or else its calls for distance must give way and the Steele tract take to the Payne, thus giving it more land than was intended it should have and the tract of 108: acres on the river less. On the other hand, if we begin with the surveyor and lay out

the Payne tract on the ground and give each tract its measurement north and wind up at the river, as the surveyor says he did in figuring the tracts in making his field notes in the office, then each gets approximately the amount the commissioners reported to the court each should have, and there would be no land unpartitioned.

[3, 4] It will further be noted that the beginning corner of the 108-acre tract was not located on the ground, but was located at the northwest corner of the Dunman, and the measurements for each subdivision were calculated from the southeast corner of the Dunman. If we had no evidence as to how these descriptions were arrived at, then we would, under the rules applicable, begin at the San Jacinto river and come south in locating the lines, because the field notes call for them that way; but since the field notes in the decree of partition do not cover all the ground, and they were all made at the same time by the same surveyor, and that which is called the beginning subdivision is of no more importance by reason of its position in the report of the commissioners as adopted by the court than any other, for the same reason that that which is designated as the beginning corner of a survey is not usually of any more importance in determining the location of a survey than any other corner in such survey, so we conclude that the laying out and platting of lands into subdivisions is one piece of work, and if there is uncertainty as to the location, the jury must pass upon the matter. State v. Sulflow, 128 S. W. 653; Lyon v. Waggoner, 37 Tex. Civ. App. 205, 83 S. W. 46. So we conclude that the trial court did not err in submitting the question to the jury.

The second assignment of error groups the fifth, sixth, and eighth as raising the same question, viz,: Did the court err in submitting the case under the following paragraphs of its charge: "(6) On the other hand, if you do not believe from a preponderance of the evidence that the said boundary line, as fixed in the Hermann-Payne partition suit, was north of the wells in question, as claimed by the plaintiffs; or if you believe the commissioners did not mean to put the boundary line north of the wells in question—then in either event named in this paragraph you will find for the defendants. (7) If you believe from the evidence that the northwest corner of the M. Bourgeois, as called for in the Hermann-Payne partition suit, cannot be ascertained with accuracy, but that its northeast corner can be, and that by reversing from that point the calls of such field notes for such tract, and then tying thereto in their order by course and distance the Boudreau, the J. D. Bourgeois, and the Hargrave tracts, the 90-foot strip in dispute will be in the Hargrave, and you believe that such result conforms to what was done and intended by the surveyor in the Hermann-Payne partition suit, then such 90-foot strip must be taken by you as placed in the Hargrave by the Hermann-Payne partition suit, otherwise not." Because the submission of the meaning or intent of the partition surveyor or commissioners, as done, was erroneous as applied to the facts of this case.

[5] Having determined that from a proper construction or interpretation of the facts of this case they show such an ambiguity as required the trial court to submit the case to the jury, then, to determine whether the charge of the court complained of was error, it becomes necessary to determine what issues involved were necessary to be passed on in order that the court might render a proper judgment.

[6, 7] As was said in Barnett v. Mahon, 31 S. W. 329: "The partition being the act of the court, the intention of the court is what is to govern." The decree consists of the approval or adoption of the report of the commissioners. This report was accompanied by an attached plat and field notes. The division intended then is that portrayed in the plat and field notes. The plat expressly made a part of the report of the commissioners, and also adopted by and made a part of the decree of the court. Since the plat covers all the ground intended to be partitioned, and the field notes as they appear in the report do not cover all the ground, the material matter of inquiry was what was the intent of the commissioners in their report, and the court's intention in its adoption by decree? So the question was whether the commissioners began at the south and platted to the north, thus fixing the line between the Hargrave and the J. D. Bourgeois, where the appellees contend it is, or whether they began at the north and coming south fixed or intended that the line in question should be fixed where appellants claim it is; and, besides, the line in question was not run, and the jury must necessarily find where it was intended to be.

What we have said above disposes of the third and fourth assignments; they having raised virtually the same questions.

[8] The sixth and seventh assignments charge that the trial court erred by its general charge in submitting to the jury as one of fact the question of agreed boundary and estoppel instead of determining the issue as one of law against the defendant.

There was ample evidence to raise the question of agreed boundary, and the court should have submitted the question, as he did, to the jury; but if we are in error in this, there being two grounds upon which defendants could recover upon a finding by a jury in their favor, and not knowing whether the first was controlling, we would not set the judgment aside.

The other assignments are to the question of oil taken from the 90-foot strip and not necessary to decide.

Affirmed.