**GUEDRY v. JORDAN et ux. (No. 1100.)**

(Court of Civil Appeals of Texas. Beaumont.
Nov. 26, 1924. Rehearing Denied
Dec. 17, 1924.)

**1. Deeds ⟨key⟩196(2)—Sales ⟨key⟩52(1)—Employé held not in confidential relation to employer.**

That decedent, aged and infirm, made his home with defendants, and employed one of them to perform specific services in looking after his stock, *held* insufficient to create confidential relation so as to require proof that conveyance of land and sale of interest in stock were reasonable and fair.

**2. Deeds ⟨key⟩211(3) — Sales ⟨key⟩52(7) — Evidence held insufficient to show fraud or misrepresentation in procuring deed and bill of sale.**

In administrator's action to set aside deed and bill of sale to a one-half interest in herd of cattle in consideration of future services, evidence *held* insufficient to show fraud or misrepresentation, notwithstanding grantor's expectancy of life was short.

**3. Deeds ⟨key⟩72(1)—Rules as to undue influence same as in case of wills.**

The same rules as to undue influence that apply to the execution of wills, apply equally to the execution of deeds.

**4. Appeal and error ⟨key⟩927(7) — In reviewing directed verdict, appellate court considers only if any testimony justifies submission to jury.**

Appellate court, in reviewing directed verdict, will look only to testimony in favor of defeated litigant to determine if there was any testimony warranting submission to jury.

**5. Trial ⟨key⟩139(1)—Verdict not properly directed, if against party whose evidence considered alone would warrant verdict for him.**

The trial court cannot properly instruct a verdict for defendant on a fact issue, where plaintiff's evidence on that issue is legally sufficient to sustain jury's finding in his favor disregarding all evidence of adversary.

**6. Deeds ⟨key⟩211(1)—Sales ⟨key⟩52(5)—Uncertainty of witness on cross-examination held not to require testimony to be disregarded, but weight was for jury.**

That witness who testified as to mental incompetence of grantor of deed and bill of sale, on cross-examination was uncertain as to last time he saw deceased, *held* not to require testimony to be wholly disregarded, but its weight was for jury.

**7. Deeds ⟨key⟩78—Sales ⟨key⟩53(1)—Evidence held to make mental capacity of grantor question for jury.**

Evidence of mental and physical infirmities of aged grantor, *held* to make issue of his mental capacity to execute deed and bill of sale, question for jury.

**8. Sales ⟨key⟩148—Bill of sale to undivided interest in branded cattle held not invalid because not acknowledged and recorded.**

The provisions of Rev. St. arts. 7170, 7172 relating to the sale and delivery of stock animals by sale and delivery of brands and marks, and requiring record of conveyance in county clerk's office, *held* not to apply to sale of undivided one-half interest in stock described by brand, although running at large, there being no sale of brand.

Appeal from District Court, Hardin County; J. L. Manry, Judge.

Action by G. P. Guedry, administrator of the estate of S. Guedry, deceased, against R. O. Jordan and wife. Judgment for defendants, and plaintiff appeals. Reversed and remanded.

Thos. B. Coe, of Kountze, W. W. Cruse and Oswald S. Parker, both of Beaumont, for appellant.

A. L. Bevil, of Kountze, and E. B. Pickett, Jr., of Liberty, for appellees.

HIGHTOWER, C. J. On the 17th day of March, 1921, S. Guedry, an old gentleman 84 years of age, and a resident of Hardin county, Tex., for many years, died in that county, intestate, leaving no wife or children, but leaving several brothers and nephews as his nearest of kin. On the 7th of March, 10 days before his death, S. Guedry, who for brevity will be hereinafter called Guedry, executed a deed to Mrs. Mary Emma Jordan, wife of R. O. Jordan, the deed being in form a general warranty deed, purporting to convey to Mrs. Jordan 150 acres of land in Hardin county at that time owned by Guedry, and fully described in the deed, and on the following day, March 8th, this deed was duly acknowledged by Guedry before W. H. Cavitt, a notary public in and for Hardin county, Tex. This deed contained, however, after the granting clause, the following reservation:

"Except, however, that the grantor herein reserves, and it is hereby expressly agreed that he shall have, for himself and assigns, the full possession, benefit, and use of the above described (150 acres) premises, as well as of the rents, issues, and profits thereof, for and during his natural life."

This deed was filed for record in Hardin county on March 18, 1921, one day after Guedry's death, and was duly recorded. The consideration for the deed, as recited, was $1, the receipt of which was acknowledged, and "other good and sufficient considerations."

On the 10th day of March, 1921, 7 days before Guedry's death, he executed and delivered to R. O. Jordan the following written bill of sale:

"The State of Texas, County of Hardin.

"Know all men by these presents that I, S. Guedry, of the county of Hardin and state aforesaid, for and in consideration of the sum of fifty and no/100 and other considerations dollars to me in hand paid by R. O. Jordan, the receipt of which is hereby acknowledged, have

---

⟨key⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

bargained, sold, and delivered and by these presents do bargain, sell, and deliver unto the said R. O. Jordan of the county of Hardin and state of Texas the following described personal property in Hardin and Liberty county, Tex., to wit, one-half interest in the following property, to wit: All of my cattle and horses branded ₵ located in the foregoing counties.

"And I do hereby bind my heirs, executors, administrators, and assigns, to forever warrant and defend the title to the said property unto the said R. O. Jordan and assigns, against every person whomsoever lawfully claiming, or to claim the same, or any part thereof.

"Witness my hand at Batson, Tex., this 10th day of March, A. D. 1921.        S. Guedry.

"Witnesses at request of grantor:
        "Dunk Fregia."

The brand shown in the bill of sale was the individual stock brand of Guedry, and was duly of record in his name. This bill of sale was never duly acknowledged for record by Guedry, and was never filed for record until March 29, 1921, 12 days after Guedry's death. While the bill of sale was never properly acknowledged for record, it was in fact, spread upon the records in Hardin county by the clerk of that county.

After Guedry's death G. P. Guedry, one of his nephews, was duly appointed administrator of his estate, and thereafter, as administrator of Guedry's estate, filed this suit in the district court of Hardin county against R. O. Jordan and his wife, Mary Emma Jordan, seeking to have the deed executed to Mrs. Jordan canceled and annulled and the cloud cast upon the title of the land therein described removed, and also seeking to have the bill of sale executed to R. O. Jordan canceled and annulled and to recover the cattle and horses therein mentioned, and some other personal property which the Jordans claimed was given Mrs. Jordan by Guedry before his death.

As grounds for the relief sought by him, the administrator, G. P. Guedry, alleged, in substance, that the deed to Mrs. Jordan and the bill of sale to Jordan were procured by fraud perpetrated by them upon Guedry, the deceased, and by the exercise of undue influence by Jordan and wife on Guedry, and further that Guedry, at the time of the execution of such instruments, did not have sufficient mental capacity to make and execute the same. The administrator further alleged that the deed and bill of sale were void, in that there was no consideration, or adequate consideration, paid, or contemplated to be paid, to Guedry for the same, and further, that Jordan and wife, and especially Jordan himself, sustained to Guedry such confidential and fiduciary relations as required the Jordans, and especially Jordan himself, in dealing with Guedry, to be fair and honest with him and to take no advantage of him by making an unreasonable and unfair deal with him, and that, in fact, Jordan and wife, and especially Jordan, did take advantage of Guedry in procuring the deed and bill of sale, and that such transactions were wholly unfair and unreasonable to Guedry, and should, therefore, be annulled and canceled and held for naught. This states, in substance, the issues made by the administrator's petition.

The defendants answered by general demurrer, several special exceptions, none of which are before us for disposition, and then denied generally and specially all the material allegations in the plaintiff's petition. Their answer also contained a cross-action in the form of trespass to try title for the recovery, as against the administrator, of the land described in the deed above mentioned.

The case proceeded to trial with a jury, but upon the conclusion of the evidence the trial court, upon motion of defendants, Jordan and wife, peremptorily instructed a verdict in favor of the defendants, and entered judgment upon the verdict so instructed to the effect that the plaintiff, administrator, take nothing by the suit, and that the defendants recover the land involved upon their cross-action. This appeal is prosecuted by the administrator upon the judgment so entered.

Appellant advances several propositions under proper assignments of error as reasons why the judgment should be reversed, and should be here rendered in his favor, both for the cancellation of the deed and the bill of sale, and for the recovery of the stock mentioned in the bill of sale. We shall not dispose of the propositions found in appellant's brief in their order, but will, nevertheless, make such disposition of them as is necessary to dispose of appellant's contentions. Before touching the propositions, however, we will make a brief statement of such of the material facts shown by the record as we deem necessary to a clear understanding of the case.

As we have stated in the beginning, S. Guedry, the deceased, was an old gentleman living in Hardin county, where he had lived for many years, and, having no wife or children of his own, he had for several years prior to his death made his home with some of his other relatives, and perhaps with others, going from one such home to another, as suited him, until he came to live at the home of the Jordans, the appellees here. Just before coming to the Jordan home, Guedry had been making his home with Mayo Fregia, who lived a short distance from the Jordans. On January 1, 1921, Mrs. Jordan invited S. Guedry, the deceased, to take New Year's dinner at the Jordan home, and Guedry accepted the invitation and came over from the Fregia home to take dinner with the Jordans. He never returned after that to the Fregia home, but thereafter, up to the time of his death,

made his home with the Jordans, and died there on the 17th of March, 1921, as we have stated.

The evidence shows, without contradiction, that Guedry as far back as September, 1920, had importuned Jordan and wife to let him live in their home, stating to them that he was old and feeble, and desired a home where he could be comfortable, and have attention, and that he was not satisfied where he was then living. The Jordans, who were in no way related to Guedry, did not grant this request of Guedry at that time, for the reason, as stated by them, that they did not have room enough in their house to accommodate him, and were not able to build more room for him, and this ended Guedry's efforts at that time to live with the Jordans. In December following, however, Guedry renewed his request to be permitted to make his home with the Jordans, but for the same reason as before the request was not at that time granted, and Guedry continued to remain at the home of Mayo Fregia, but when he came over to take New Year's dinner, as we have stated, with the Jordans, he again requested them to let him remain there and make it his home, and stated to them, in substance, that he would pay for the building of additional room to the house and would be glad to do so, and thereupon the Jordans agreed that Guedry might remain at their home from then on, he paying for his board and attentions to be given him in his aged and infirm condition, and thereafter he did, at his own expense, add more room to the Jordan house and became a member, so to speak, of the family.

The evidence shows that Guedry was possessed of sufficient means in the way of land and cattle and horses and perhaps some money to keep himself in comfort, and that he was liberal with the Jordans in paying for his home and attentions there. The evidence further shows that the Jordans were very attentive to Guedry after he had gone to their home to live, and that he was fully satisfied and pleased with the way they treated him and waited on him up to the time of his fatal illnesss.

The evidence further shows that about March, 1920, Guedry had employed R. O. Jordan to look after his stock, that is, to brand calves and colts for him, doctor the stock for worms when attacked, and to sell such of his stock as Guedry might direct. The evidence shows that for such services Guedry allowed Jordan the usual compensation paid by stock men for such services, that is to say, so much a head for branding calves, so much a head for branding colts, so much a head for stock sold, and so much for the treatment of them when necessary. This employment of Jordan by Guedry continued from March, 1920, up to the time of Guedry's death, and the proof shows that Jordan performed the services contemplated

by his employment to the satisfaction of Guedry, and was always compensated by Guedry as agreed. The evidence further shows that shortly after going to the Jordan home, Guedry made Mrs. Jordan a present of an automobile which he then owned, and also gave to her a victrola and some other little items of personal property, all of which was sued for by the administrator, and claimed to be the property of Guedry's estate.

[1] Taking up at this point appellant's contention that the evidence in this case showed that R. O. Jordan sustained such confidential and fiduciary relations to Guedry as required him to deal fairly and honestly with Guedry, and to make no trade or deal with him that was not fair and reasonable to Guedry, we shall dispose of the same by saying, as the undisputed proof in this record warrants, that Jordan did not sustain to Guedry such confidential and fiduciary relations as claimed by appellant. In this connection, appellant invokes the rule relative to transactions between guardian and ward, attorney and client, and which in some instances has been applied as between principal and agent. We say that the rule has no application here, for the very plain reason that the undisputed proof in this case shows that Jordan was only employed by Guedry, as we have stated, to look after his cattle and horses in the manner stated, and for the usual compensation for such services, and that Jordan had no control of Guedry's stock to any other or greater extent. He was not authorized by Guedry to sell a single head of his stock, or to incumber them in any way, and he did not, as the undisputed testimony shows, at any time, attempt to do so, or in any manner handle any of Guedry's stock except as directed by Guedry himself, and he did not, as the undisputed proof shows, at any time undertake to advise Guedry as to how his stock should be handled and disposed of, but, on the contrary, as we read the record, Guedry was the managing and directing head at all times, and Jordan followed loyally and faithfully Guedry's directions. When stock were sold, the consideration was paid to Guedry himself, and when evidenced by checks of the purchasers, Guedry deposited the money in the bank and had full control and management of it without any suggestions or advice from Jordan. These are the undisputed facts, and it is our opinion that they fall far short of showing that there was any confidential and fiduciary relationship existing between Guedry and Jordan that required proof on Jordan's part that any deal he made with Guedry must be shown to be reasonable and fair to Guedry before it could have validity. That is exactly appellant's contention, and we must overrule it. At the most, as we see it, Jordan was never at any time more than an ordinary employé

of Guedry to perform limited and specific services for Guedry, for the usual compensation paid for such services, and he was in no sense such an agent of Guedry as claimed by appellant. This, in effect, disposes of appellant's contention, made by several propositions, that the deed and bill of sale above mentioned were void because appellees failed to prove that the transactions represented by them were fair and reasonable to Guedry, nor did the trial court err in refusing to submit to the jury the special issues requested by appellant in that connection.

[2] With reference to appellant's contention that the deed and bill of sale were the result of fraud and misrepresentations perpetrated by the Jordans upon Guedry, we have to say, upon the undisputed record, that there is no basis for such contention. There isn't even a scintilla of evidence in this record that either Jordan or his wife ever made any false or misleading representations or pretenses to Guedry at any time.

There is nothing in this record that even tends to prove that Jordan and his wife, or either of them, ever exercised, or attempted to exercise, any undue influence over Guedry at any time, and especially nothing to indicate that the deed and bill of sale, or either of the instruments, was the result of any such influence. It is very clear from the evidence in the case, we think, that in making the deed to Mrs. Jordan, Guedry expected to reap as consideration therefor the care and attention of Jordan and wife as long as he might live, and to have the use of their home for his home, and that, as long as he did live he had such attentions and services and use of their home, and would have continued to reap such consideration as long as he might have lived, and so desired.

As to the bill of sale, we might state here that the evidence shows without dispute that it was contemplated by Guedry and Jordan that Jordan should look after Guedry's cattle and horses in Hardin and Liberty counties, as he had been doing prior to the execution of the bill of sale, but that since he would have an undivided one-half interest in such stock, he would not be expected to charge Guedry the usual compensation for his services, as he had theretofore done, and that it was Guedry's request that all the stock be kept together notwithstanding Jordan's half interest in them, as long as Guedry might live. It is very clear from the record that it was necessary for some one to look after Guedry's stock, because he was old and infirm and unable to do so himself, and if he thought that it was to his best interest to have Jordan do so upon the terms as stated by us, it was his legal right to make such arrangement, and it is not open to courts to deny him that right.

It is true, as argued by appellant, that according to the laws of nature, Guedry, being about 84 years of age at the time he executed the deed and bill of sale in question, could not reasonably have expected to live a great length of time thereafter, but if he, at that time, had sufficient mental capacity to understand the nature of these transactions, and was not unduly influenced to make them, as claimed by appellant, they must stand as made and be given effect by the courts.

According to the testimony of appellant, while a witness on the stand, the land described in the deed to Mrs. Jordan was of the value between $4,000 and $5,000, and the evidence was sufficient, perhaps, to show that the value of the cattle and horses running on the range in Hardin and Liberty counties, a one-half interest in which was conveyed by the bill of sale, were of the total value of between $3,000 and $4,000, if we remember correctly the record.

We have been unable, after diligent search of this record, to find one fact or circumstance indicating that either Jordan or his wife ever, on any occasion, attempted to advise or influence Guedry to do anything, much less to make the disposition of his property as he did by the deed and bill of sale. According to the testimony of Jordan, and there is nothing to the contrary, Guedry himself conceived the idea of executing both of these instruments, and told Jordan why he would do so. It is true that Mrs. Jordan never knew that the deed had been executed in her favor at the time of its execution, nor had Guedry told her that he contemplated making the deed to her, but, according to the testimony of both Jordan and his wife, Guedry had, on several occasions, told them that if they would take care of him and give him a good home the balance of his life, he would take care of them.

[3] We have stated above substantially all the evidence in this case, as we see it, having any tendency whatever, as claimed by appellant, to show undue influence practiced upon Guedry by the Jordans in procuring the deed and bill of sale, and it is our conclusion that such evidence was wholly insufficient to even raise such issue. This court had occasion to discuss at some length the question of undue influence, as it pertains to the execution of wills, in the case of Holmes v. Houston (Tex. Civ. App.) 241 S. W. 1039, and we there cited and discussed a number of authorities touching that question, among them being, as we conceive, the leading cases in this state on that question. The rule can be no different when applied to the execution of a deed. In the case mentioned we expressed our views fully as to what was required to be shown in order to establish the issue of undue influence, that is, the character and quantum of proof, and it would serve no useful purpose to here discuss the question again. Suffice to say, as

we have already stated, that there was no issue of undue influence raised by the evidence in this case, as to the execution of either the deed or bill of sale, and we overrule appellant's contention that the court should have instructed a verdict in his favor on that issue, and also his contention that at all events that issue should have been submitted as one of fact to the jury.

We now came to appellant's contention that the trial court should have submitted to the jury as an issue of fact Guedry's mental capacity to execute the deed and bill of sale. It is appellant's contention in this connection that the evidence adduced by him upon this issue, standing alone and of itself, was legally sufficient to warrant the finding by the jury that Guedry, at the time of the execution of the deed and bill of sale, did not have sufficient mental capacity to understand and appreciate the nature of those transactions, and that the issue being so raised, the court was compelled to leave it as one of fact to the jury. We have reached the conclusion that appellant is right in this contention, and must sustain it.

[4, 5] If we properly understand the rule, where a verdict is peremptorily instructed by the trial court, the appellate court will determine the correctness or incorrectness of that action by determining whether there was any evidence legally sufficient to carry the claimed issue of fact to the jury for their consideration. In doing so, the appellate court must, as the trial court should have done, disregard all testimony adduced in favor of the party litigant for whom the verdict was instructed. In other words, the rule is, as we understand it, that the trial court can never properly instruct a verdict for the defendant on a fact issue where the plaintiff's evidence on that issue is legally sufficient to sustain a jury's finding in his favor, and in determining whether the evidence adduced by the plaintiff was legally sufficient to sustain a jury's finding in his favor, all evidence introduced by the adversary must be disregarded. In other words, the evidence introduced by the defendant must not be weighed against that introduced by the plaintiff, however strong and however much it may preponderate, in the opinion of the court, in favor of the defendant. The rule where the verdict is directed is stated by some of our appellate courts as follows:

"The trial court may only direct a verdict for a defendant where there is no evidence supporting the claim of the plaintiff." Crowley v. Finch (Tex. Civ. App.) 153 S. W. 648.

Again:

"A trial court is not authorized to direct a verdict for the defendant unless the evidence is of such a character that as a matter of law no other verdict can be rendered." Walker v. Railway Co., 51 Tex. Civ. App. 391, 112 S. W. 430.

Again:

"Where a party plaintiff introduced evidence sufficient to support an issue of fact pleaded by him, when considered in the most favorable aspect by him, he is entitled to have such issue submitted to the jury, no matter how strong the contradictory evidence offered by his adversary may be." Eastham v. Hunter, 98 Tex. 560, 86 S. W. 323. Harpold v. Moss, 101 Tex. 540, 109 S. W. 92; Consumers', etc., Co. v. Hubner (Tex. Civ. App.) 154 S. W. 253; Lumber Co. v. Railway Co., 106 Tex. 12, 155 S. W. 176; Holtzclaw v. Moore (Tex. Civ. App.) 192 S. W. 583; Clark v. Briley (Tex. Civ. App.) 193 S. W. 419; Drew v. American, etc., Co. (Tex. Civ. App.) 207 S. W. 548; Hoot v. Walker County Lumber Co. (Tex. Civ. App.) 219 S. W. 544.

We shall now proceed to mention the evidence introduced by appellant as the plaintiff below touching the issue of Guedry's incapacity to execute the deed and bill of sale, and see whether under the rule as we have stated it above, pertaining to instructed verdicts, required the submission of this issue to the jury. Dr. N. E. Laidacker, a physician of many years' experience, testified, in substance, as follows:

He knew Guedry, the deceased, for more than 17 years before his death, and for a number of years before his death treated him professionally. During that period, Guedry, so the doctor testified, was a sufferer from Bright's disease, which gradually grew worse and greatly weakened him physically and mentally. The last time this physician treated Guedry was about 6 months before his death. At that time Guedry was staying at the home of appellant in this case, near where Dr. Laidacker was residing, and for several months, while Guedry was there, the doctor saw him on an average of once or twice a week, and was treating him regularly as a sufferer from Bright's disease. During that time, as this physician testified, on several occasions Guedry did not recognize Dr. Laidacker, notwithstanding he had known and treated Guedry professionally for years before that time. This physician stated that at the time he regarded Guedry's mental state as exceedingly bad. He testified that at that time he did not consider that Guedry was mentally competent to transact any ordinary business affairs. He would not swear, however, that Guedry was in such mental condition at the time he executed the deed and bill of sale here in controversy, because he had not seen Guedry for some six months prior to that time. He was emphatic, however, that Guedry was a sufferer from Bright's disease, and had been for some years prior to his death, and that the tendency of this disease was to weaken the victim, not only physically, but mentally as well, and that it was his observation in Guedry's case that the disease gradually

grew worse and continued to weaken him both physically and mentally as it grew.

[6] Dr. J. R. Smith, a physician of several years' experience, had known Guedry several years before his death, and at times had treated him professionally. This physician stated that Guedry was afflicted with Bright's disease in an advanced stage for several years prior to his death, and that such disease affected him both physically and mentally. This physician testified that he saw Guedry about two months before his death, and that at that time Guedry was not mentally competent to transact any ordinary business. He testified that he saw Guedry again about a week before his death, at the home of the Jordans, and that at that time Guedry was not mentally competent to transact any ordinary business, and had not been so competent for a period of at least 30 days before that time. If this witness, in fact, saw Guedry at the home of the Jordans a week before his death, it was the very day that the bill of sale in controversy was executed by Guedry. On cross-examination this witness was very uncertain as to whether he saw Guedry a week before his death, as he had first stated, and it is the contention of counsel for appellees that by reason of this uncertainty on his part, as shown by his cross-examination, his testimony should be wholly disregarded. We cannot agree with counsel for appellee in this contention, but think that this physician's testimony as a whole was a matter for the consideration of the jury, both as to the credence that should be given it, and its weight as bearing on the question of Guedry's mental capacity.

Z. E. Guedry, a grandnephew of the deceased, testified, in substance, that the deceased made his home with witness' father's family for about two years off and on before deceased went to live with the appellees, the Jordans; that during most of such period of time deceased was sick and almost helpless physically, and his mind appeared to witness to be very weak at frequent times; that such condition of Guedry's mind continued practically up to the time he left witness' home. This witness further stated that he saw Guedry twice after he went to Jordan's home (the last time was 7 or 8 days before Guedry's death), and that on both such occasions Guedry was very ill and appeared to be suffering much pain; that on the last occasion (7 or 8 days before Guedry's death) Guedry did not know witness, but thought he was Dr. Roark, and addressed witness as Dr. Roark. This witness stated that in his opinion, based upon his long acquaintance with and observation of Guedry, that he was not mentally able to transact ordinary business affairs on either date that he saw him at the Jordan home. If it was exactly 7 days before Guedry's death that this witness last saw him, and he was in the mental condition as the witness stated he was at that time, this evidence tended strongly to show that Guedry was not mentally capacitated to execute the bill of sale in controversy in this case, which bore date March 10, 1921.

Hugh Guedry, also a grandnephew of the deceased, and brother of Z. E. Guedry, gave substantially the same testimony as was given by his brother. He further stated that in his opinion the deceased at the time he left witness' father's home was not mentally competent to transact ordinary business affairs. He further testified that he saw the deceased once after he went to Jordan's home and before his death, which was about the last of February or first of March before Guedry's death, and that at such time the deceased was not mentally competent to transact ordinary business affairs. True, witness declined to say positively that such was the state of the deceased's mind, but he persisted that in his opinion such was the fact.

Mrs. Josie Guedry, wife of G. P. Guedry, the appellant, testified, substantially, that the deceased spent most of the summer of 1920 at their home, and left there about the 1st of September of that year; that deceased was sick and complaining most of the time that he was in witness' home, and wanted the doctor with him constantly; that he was very weak physically, and witness thought his mind at that time was not "right." This witness further testified that on February 13, 1921, upon hearing of Guedry's serious illness, she went to see him at the home of the Jordans, and that he was then sick and in bed; that Guedry did not realize that witness was present, though she shook hands with him and talked to him a little while. It was her opinion that Guedry's mind on that occasion was such that he could not transact ordinary business affairs. She declined to express any opinion as to Guedry's mental condition between February 13th and the date of his death.

[7] The foregoing is, we think, a fair statement, in substance, of the evidence adduced by appellant as plaintiff below tending to establish the issue of mental incapacity on the part of Guedry, as claimed by appellant in this suit. It is our opinion that when we apply the rule, as we have stated it, in determining the correctness of the trial court's action in instructing the verdict, this evidence was sufficient to carry to the jury the issue of Guedry's lack of mental capacity to execute either the deed or bill of sale here in controversy. As we have shown, in stating the rule, all testimony offered by the appellees on this issue must be disregarded, however strong it may be, in determining whether the action of the trial court in instructing the verdict in this case was cor-

rect. It must be admitted that in the opinion of this court the testimony introduced by the appellees, tending to show that Guedry's mental condition was all right at the date of the execution of the deed and bill of sale, was very strong, and perhaps largely preponderates in favor of sufficient mental capacity at that time. It would serve no useful purpose to here recite the substance of the evidence introduced by appellees upon this issue, because at last, under the rule, it could not be weighed against that introduced by the appellant in determining the correctness of the trial court's action in peremptorily instructing the verdict. We have not the question before us as to whether a jury's verdict is sustained by the evidence in this case, but only the question as to whether, applying the rule, the trial court was authorized to peremptorily instruct the verdict as he did. We must hold that the trial court's action in this regard was unauthorized, and sustain appellant's contention as to that point.

[8] There is one further legal question presented by appellant in this case touching the validity of the bill of sale from Guedry to R. O. Jordan for the one-half undivided interest of Guedry's cattle and horses ranging at time in Liberty and Hardin counties. To state this contention briefly, it is that the bill of sale was null and void for the reason that it was not acknowledged and recorded or filed for record during Guedry's lifetime, and, that since it was agreed in this case that the cattle and horses covered by the bill of sale were the property of Guedry at the time of his death, unless it passed to Jordan by the execution of the bill of sale, appellant was entitled to have the same canceled and recover the cattle and horses as prayed by him. In this connection, appellant invokes the provision of article 7172 of the Revised Statutes of this state. That article reads as follows:

"Persons may dispose of stock animals of the kind mentioned in article 7170, as they run in the range, by the sale and delivery of the brands and marks; but in every such sale the purchaser, in order to acquire title thereto, shall have his conveyance or bill of sale of such stock recorded in the county clerk's office, in a book to be kept by him for that purpose; and such sale or transfer shall be noted on the record of original marks and brands in the name of the vendee or purchaser."

This statute was enacted in 1866, and was then article No. 4564 (Rev. St. 1879). We have above copied the bill of sale in question, and we think that it is very clear, from the face of the instrument itself, that Guedry did not intend to sell to Jordan, and Jordan did not intend to purchase from Guedry, Guedry's brand or brand and marks. The bill of sale, upon its face, purported only to convey an undivided one-half interest in Guedry's cattle and horses ranging at that time in Liberty and Hardin counties.

In support of his contention that the bill of sale was void because not acknowledged for record and filed and recorded before Guedry's death, appellant cites the case of Black v. Vaughan, 70 Tex. 47, 7 S. W. 604. We have read with much interest the decision of Judge Willie in the Black Case, but are unable to agree with appellant's able counsel that that authority is decisive on the point now under consideration. It does not appear from the decision in the Black-Vaughan Case just what the instrument was that the court there had under consideration. Judge Willie said that it conveyed "a stock of cattle" running on the range, described only by the brand on the stock. How many cattle were sold the opinion does not reflect, nor does it reflect whether it was all the stock of cattle owned by the vendor in that case, or only a portion of his stock described by his brand. The case did not get before the court on a full statement of facts, as the opinion reflects, but only upon the trial judge's findings of fact and conclusions of law. Judge Willie did reach the conclusion in that case that the bill of sale, whatever its purport was, was null and void because not acknowledged or recorded, as required by article 7172. Later cases, however, all seem to hold that this article has application only where stock running on the range are sold or described only by the brand of the owner, and where it is the intention of the vendor to sell his brand to the purchaser, as well as the stock themselves. We shall not go into this point at length, but merely cite the cases which we believe sustain appellees' contention that where it is not the intention of the seller of the stock to convey to the purchaser his brand, that article 7172 does not apply, and does not affect the validity of the sale. In other words, it is the contention of appellees' counsel, and we think he is sustained by the authorities of this state, that where the intention of the seller is only to sell certain of his stock, although running on the range, whether it be an undivided or a specific number of such stock, and described only by the owner's brand, to sell to the purchaser only such number of such stock, and not the whole, and not the owner's brand, or brand and marks, then article 7172 has no application, and the sale is valid if otherwise established. See Nance v. Barber, 7 Tex. Civ. App. 111, 26 S. W. 151; Rankin v. Bell, 85 Tex. 28, 19 S. W. 874; National Bank v. Emery, 78 Tex. 512, 15 S. W. 23; Swan v. Larkin, 8 Tex. Civ. App. 421, 28 S. W. 217.

The bill of sale from Guedry to R. O. Jordan was established by a common-law proof of its execution, and since we hold that article 7172 does not apply to that instrument, we overrule appellant's contention that it

was null and void for the reason that it was not acknowledged and recorded as required by article 7172.

Because of the court's error in declining to submit for the jury's consideration the issue of S. Guedry's mental capacity to make the deed and bill of sale in controversy, this judgment must be reversed and the cause remanded for a new trial, in accordance with the views we have expressed.