## TAYLOR et al. v. HIGGINS OIL & FUEL CO. et al. (No. 1213.)

Court of Civil Appeals of Texas. Beaumont. Jan. 11, 1928.

Rehearing Denied Jan. 25, 1928.

**1. Mines and minerals ⬳48, 73—Oil lease is sale of portion of land; ordinary form of oil lease is, in effect, sale of portion of land.**

Oil is part of land and can be sold in place, so that ordinary form of oil lease is, in effect, sale of portion of land.

**2. Mines and minerals ⬳73—Oil leases create severance of estate in surface from estate in oil.**

Oil leases create severance of estate in surface from estate in oil and minerals which may be owned in their entirety by different parties.

**3. Mines and minerals ⬳79(1)—Royalty interest of lessor under oil lease is "estate in land."**

Royalty interest retained by lessor in oil lease, whether owned by original lessor or his vendees, is "estate in land" to be held and sold only under laws regulating sale of land.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Estate.]

**4. Tenancy in common ⬳3—Lessor under oil lease, retaining royalty interest, owned estate in surface and was tenant in common with tenant in estate in oil.**

Lessor under oil lease, retaining royalty interest, *held* to own estate in surface of land and to be tenant in common with lessee in estate in oil and other minerals.

**5. Abandonment ⬳7—Mines and minerals ⬳77—Title cannot be divested by declaration of abandonment, hence lessee's fixing of boundary in manner to exclude land covered by lease did not constitute abandonment thereof or revest lessor with title.**

Lessor under oil lease did not reacquire absolute title to land covered by lease by lessee's act in locating leased property so as to exclude such land, since title which was vested could not be divested by mere declaration of abandonment.

**6. Trespass to try title ⬳6(1)—In lessor's action to recover leased land, lessee's disclaimer did not reinvest plaintiff with title sufficient to sustain suit against claimant under another lease.**

In action by lessor under oil lease to recover title and possession of tract included within lease previously given, disclaimer filed by lessee *held* not to reinvest plaintiff with title sufficient to sustain suit as against lessee under another lease claiming land in controversy.

**7. Trespass to try title ⬳6(1)—In trespass to try title, plaintiff must make affirmative showing of title to prevail.**

In action of trespass to try title by lessor under oil lease for recovery of title and possession of certain land, plaintiff must make affirmative showing of title to prevail against defendant claiming land by metes and bounds.

**8. Trespass to try title ⬳6(1)—Lessor under oil lease may maintain trespass to try title against any one entering land except lessee.**

Lessor under oil lease may maintain action in trespass to try title against any one entering land except lessee, since lessor has title to surface rights and courts will protect him in that right as against trespassers.

**9. Tenancy in common ⬳55(1)—Lessor under oil lease as tenant in common with lessee may maintain action against trespasser and recover possession of whole estate in minerals.**

Lessor under oil lease, being tenant in common with lessee in mineral rights in land, may maintain action against trespasser and as against him recover possession of whole estate in minerals.

**10. Tenancy in common ⬳55(1)—Tenant in common may maintain action to recover whole of land from person having no title.**

General rule is that one of several tenants in common may maintain action to recover whole of land from person having no title.

**11. Trespass to try title ⬳35(4)—In trespass to try title, evidence showing plaintiffs tenants in common in mineral estate did not constitute variance from allegation of ownership of fee.**

In action of trespass to try title, evidence showing plaintiffs to be tenants in common in

mineral estate in land as lessors under oil lease *held* not to constitute variance from pleading alleging ownership of entire fee.

**12. Trespass to try title ⬦47(1)—Successful party in trespass to try title recovers adversary's title as fully as if by voluntary conveyance.**

Successful party in trespass to try title recovers his adversary's title as fully as if by voluntary conveyance.

**13. Trespass to try title ⬦47(2)—In trespass to try title, it was fundamental error to refuse plaintiff judgment on disclaimer by one defendant in plaintiff's favor.**

Where in action of trespass to try title by lessor under oil lease against several defendants there was disclaimer by one defendant in favor of plaintiff, it was fundamental error for court to refuse to award plaintiff judgment on that disclaimer.

**14. Trespass to try title ⬦47(1)—Judgment in trespass to try title can have no support unless issue is raised by pleadings.**

In trespass to try title brought by lessor under oil lease, judgment of court can have no support unless issue is raised by pleadings so that defendant had no judgment based on disclaimer by codefendant, where by pleadings it did not claim land as against plaintiff's theory of location of boundary under which disclaimer was made.

**15. Boundaries ⬦47(1)—Plaintiff who did not know where boundary of land was, and whose privies in title had never made specific representation as to location, held not estopped by recitals in deeds to deny boundary claimed by defendant.**

In trespass to try title plaintiff *held* not estopped to deny location of west boundary of tract at place claimed by defendant, notwithstanding statements in numerous deeds of plaintiff's chain of title favorable to defendant's contention, where plaintiff did not know where west boundary was situated on ground and none of his privies in title ever made specific representation as to location of boundary nor had it surveyed.

**16. Boundaries ⬦7—Disputed northwest corner of tract held, as matter of law, properly located on ground at recognized distance along north boundary extending from recognized northeast corner through middle division corner.**

In trespass to try title in which location of northwest corner of tract was disputed, such corner *held*, as matter of law, located on recognized north boundary line running from northeast corner through middle division corner for recognized distance beyond such middle division corner, as against contention that location should be from stake at northwest corner of south third of tract placed 19 years after original survey.

**17. Boundaries ⬦3(1) — In locating disputed boundaries, preference must be given to more specific and definite rather than general calls.**

In locating disputed boundary lines, preference must be given to calls of original grant which in their application to particular facts in issue are more specific and definite in preference to others merely general and indefinite or descriptive.

**18. Boundaries ⬦3(1)—In locating boundary, general rule is that calls are of primary importance in following order: Natural objects, artificial objects, course, and distance.**

General rule is that in locating disputed boundary lines calls are of primary importance in following order: Natural objects, artificial objects, course, and distance.

**19. Boundaries ⬦35(1) — In establishing boundary years after survey, court may resort to any evidence tending to establish place where original surveyor ran line which is "best evidence" of which case is susceptible.**

Since every rule of evidence for guidance in boundary questions is to ascertain place at which original surveyor ran line, courts in establishing line years after survey may resort to any evidence tending to establish place of original footsteps which meets requirement that it is best evidence of which case is susceptible; "best evidence" being that which is more specific and definite as against that which is merely general and indefinite or descriptive.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Best Evidence.]

**20. Boundaries ⬦40(1) — Determination of boundary becomes question of law, where reasonable minds cannot differ as to conclusions deducible from facts.**

Determination of boundary years after original survey becomes question of law, when on particular facts reasonable minds cannot differ as to conclusions legally deducible from facts.

**21. Boundaries ⬦40(1) — Determination of boundary becomes law question, when one theory is supported by specific and definite facts, while the other is supported by general and indefinite evidence.**

Determination of boundary line years after original survey is question of law for court, when one theory of case is supported by specific and definite facts, while the other is supported by evidence merely general and indefinite or descriptive.

**22. Boundaries ⬦3(7)—Call for line of adjoining survey should not prevail over call for distance, unless such line can be located with reasonable accuracy.**

Call for line of adjoining survey should not be permitted to prevail over call for distance in determining disputed boundary, unless such line itself can be located with reasonable accuracy and certainty.

**23. Boundaries ⬦3(5) — Where natural and artificial objects of original grant cannot be identified, location of lines and corners will be controlled by course and distance from nearest recognized and established "corner" or "object" with which field notes connect.**

Rule is that where natural and artificial objects of original grant cannot be identified on ground, location of lines and corners will be controlled by course and distance from near-

---

⬦For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

est recognized and established corner or artificial object for which field notes connect, and in application of such rule "corner" and "object" referred to mean corner or object of original grant.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Corner; Object.]

**24. Boundaries ⬥3(1), 35(1)—Calls for corners and objects made in subdividing original grant are admissible, but do not ordinarily prevail in locating steps of original surveyor.**

Rule is that calls for corners and objects made in subdividing original grant do not prevail in locating steps of original surveyor, but such calls in subdivision as well as calls of junior surveys may be admissible and, under certain circumstances, controlling.

**25. Boundaries ⬥7—Where surveyor in making subdivision called for original objects which subsequently disappeared and established new corners on original lines, such corners assumed dignity of original calls in locating original corners and lines if surveyor was dead.**

Where in making subdivision of original grant surveyor found natural or artificial objects called for by original surveyor which subsequently disappeared and in making subdivision called for such original objects and established new corners on original lines of survey, such corners assumed dignity of original calls in locating original corners and lines on which these inside calls were based, when it is shown that surveyor who made them is dead.

**26. Boundaries ⬥33—There is presumption that stake placed at corner of tract by original surveyor was found by one making survey 19 years later.**

Where survey of tract was made only 19 years after original survey, presumption arises that stake placed at northwest corner by original surveyor was found.

**27. Boundaries ⬥33—Where surveyor made no reference to beginning corner called for by original survey, no presumption arises that he found it.**

Where surveyor made no reference to beginning corner of league nor to southeast corner of another league as called for by original surveyor, no presumption arises that he either looked for or found beginning corner.

**28. Boundaries ⬥33—Plaintiff establishing corner by running line on calls of original grant based on corner established after original survey by surveyor, whose work showed material variation from original call, must show variation was corrected.**

In trespass to try title, plaintiff attempting to establish northwest corner of tract by running line from corner established by surveyor 19 years after original survey on calls for original grant for course, in face of subsequent surveyor's work showing material variance from such call, *held* to have burden to show that such variation had been corrected.

**29. Boundaries ⬥33—General reputation of location of line is presumed to arise from knowledge of location of original surveyor's footsteps.**

Location of boundary line may, under certain circumstances, be shown by general reputation, and, if origin of reputation is unexplained, presumption is that it arose from knowledge of location of footsteps of original surveyor.

**30. Boundaries ⬥35(2)—Reputation as to location of line originating from survey by surveyor, not shown to have known location of line, is inadmissible unless it is best evidence available.**

Reputation as to location of original line originating from survey made by surveyor, who was not shown to have known of location of such line, is not admissible except where it is best evidence available.

**31. Appeal and error ⬥927(7)—Generally in testing instructed verdict, reviewing court must disregard testimony favorable to successful party.**

In boundary suit, general rule is that, in testing instructed verdict, appellate court must disregard all testimony adduced in favor of party for whom verdict was instructed.

**32. Boundaries ⬥40(1)—Where facts are not disputed, location of boundary is question of law.**

In suit involving disputed boundary in which facts are not in dispute and only question involved is correct application to facts of well known principles of law, location of boundary is question of law for court and verdict should be instructed.

**33. Boundaries ⬥6—Boundary must be ascertained by course and distance given in patent, where no marked trees are on ground identified as those of grant.**

Where no marked trees are on ground identified by evidence as those of grant, true boundary must be ascertained by course and distance given in patent.

**34. Boundaries ⬥33—In trespass to try title, plaintiff held to have burden to show boundary of larger tract that would leave in existence tract in controversy.**

In trespass to try title by lessor under oil lease, burden *held* to have rested on plaintiff to show location of west boundary line of tract including several smaller tracts that would leave in existence tract of land in controversy.

**35. Trespass to try title ⬥56—In trespass to try title, lessor under oil lease, though unsuccessful, held entitled to judgment for expenditures in developing land to prevent loss.**

In trespass to try title by lessor under oil lease, plaintiff, though unsuccessful, *held* entitled to judgment for improvements made in good faith in developing land in controversy for oil, action being justified, since if not taken oil under such land could and might have been drilled out by lessees of land adjacent which was being developed, notwithstanding that plaintiffs' contention of good faith rested on sole ground that they honestly misjudged law.

---

⬥For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**36. Trespass to try title ⊛⇒57—Willful trespassers expending money for development of oil cannot recover expenditures.**

Where persons making expenditures in developing land for oil are willful trespassers, punishment meted out to them by law is loss of cost of such development.

**37. Courts ⊛⇒247(5)—Where questions were certified to Supreme Court and certificate dismissed for lack of jurisdiction, case should not be sent back on new certificate involving same question.**

Where questions were certified to Supreme Court which dismissed certificate for lack of jurisdiction, case should not be sent back to Supreme Court on new certificate which is, in legal effect, recertification of one question contained in original certificate.

Appeal from District Court, Liberty County; J. L. Manry, Judge.

Suit by H. Taylor and others against the Higgins Oil & Fuel Company and others. Judgment for defendants, and plaintiffs appeal. Affirmed in part, and reversed in part, and remanded.

See, also (Tex. Com. App.) 298 S. W. 891.

Llewellyn & Kayser, of Liberty, for appellants.

Stewart, De Lange & Milheiser, Huggins, Kayser & Liddell, Vinson, Elkins & Wood, and Bryan, Dyers & Colgin, all of Houston, L. C. Kemp, J. A. McNair, McDonald Meachum, and Baker, Botts, Parker & Garwood, all of Houston, W. W. Cruse, of Beaumont, and E. B. Pickett, Jr., and C. R. Wilson, both of Liberty, for appellees.

WALKER, J. This is a boundary suit instituted by appellants H. Taylor, individually and as guardian of his four minor children, and H. Mecom against the Higgins Oil & Fuel Company and Houston Production Company, as defendants, for recovery of the title and possession of a tract of land of 1.27 acres out of the Jesse Devore league, in Liberty county, Tex. Other parties were brought into the case after its institution, but as their interests are merely incidental to the question involved, it is not necessary to make further reference to them. The existence and location upon the ground of this tract of 1.27 acres of land depends upon the location of the west boundary line of the league. Judgment was rendered against plaintiffs in the trial court upon an instructed verdict, from which they have duly prosecuted their appeal.

The first question to be considered is whether appellants, as plaintiffs, had such title as would support an action in trespass to try title. The Devore league was surveyed in 1835. By its calls for distance, the north boundary line of the league was 4,426 varas long. In 1854 the league was divided into east and west halves by surveying from the northwest corner. The northeast corner of the west half was fixed at a point by the call of the surveyor doing the work 2,213 varas east of the northwest corner. This same surveyor divided the west half into thirds by running the division lines parallel with the north and south boundary lines of the league. The owner of the north third sold to Caleb Higginbotham a tract of 50 acres out of the northeast corner of his third, 531.2 varas long by 531.2 varas wide. The north boundary line of this tract consumed 531.2 varas of the north boundary line of the league, running west from the middle division corner; that is, from the northeast corner of the west half. The east boundary line of this 50 acres consumed 531.2 varas off of the north end of the division line of the league running south that distance from the division corner in the north boundary line; that is, from the northeast corner of the west half. The lines and corners of this 50-acre tract were shown without controversy and no issue arose as to their location upon the ground. This 50-acre tract passed from Higginbotham to a man named Stengler and is known in the record and will be referred to hereinafter as the Stengler tract. H. D. Moor acquired title to 158.5 acres out of the north one-third of the west one-half, which said 158.5 acres was out of the extreme north end of the west one-half, and was 1,682 varas long by 531 varas wide. The north boundary line of this H. D. Moor tract was a common line with the north boundary line of the league from the northwest corner of the Stengler tract of 50 acres to the northwest corner of the league. The east boundary line of this H. D. Moor tract was a common line with the west boundary line of the Stengler tract for its entire distance of 531 varas. The west boundary line of this H. D. Moor tract was a common line with the west boundary line of the league south from its northwest corner for its distance of 531 varas.

After the death of H. D. Moor, by decree of the district court, his tract of 158.5 acres was partitioned among his three children in three parallel strips, each 1,682 varas long, running with the north boundary line of the league, and 177 varas wide. The north strip was awarded to the son, Hubert, the middle strip to the daughter Zona, and the south strip to the daughter Elsie. Hubert and Zona died without heirs other than their sister, Elsie, who inherited on their death their two strips of land. Before her death Zona sold a tract of 6.5 acres off the east end of her tract to a man named Canter. This tract of 6.5 acres was the width of the Zona Moor tract, that is, 177 varas, and its east boundary line was a common line with the Strengler west boundary line, for its distance of 177 varas. The northeast and southeast corners of the Zona

Moor tract were in the Stengler west boundary line, and the north and south boundary lines of the Canter tract extended west from the Stengler west boundary line 217.7 varas for the northwest and southwest corners of the Canter tract. No issue arose as to the location of the lines and corners of the Canter tract. Elsie died, leaving surviving her her husband, Hubert Taylor, and four minor children. As guardian of his children, Hubert Taylor leased to H. Mecom a tract of land containing 4.48 acres off the east end of the Zona Moor tract with its northwest corner and its southwest corner in the north and south boundary lines of the Zona Moor tract and 143 varas west of the northwest and southwest corners of the Canter tract. These calls of the 4.48 acres consumed 143 varas of the north and south boundary lines of the Zona Moor tract, extending that distance west from the northwest and southwest corners of the Canter tract. On these calls the east boundary line of the 4.48 acres was a common line with the west boundary line of the Canter tract. Afterwards, Taylor for himself and wards executed a mineral lease to Nash on a tract of land containing 6.7 acres of the Zona Moor tract lying immediately west of the Mecom tract, and tied to that tract. This Nash tract had its northeast corner a common corner with the Mecom northwest, its east boundary line a common line with the Mecom west boundary line and its southeast corner a common corner with the Mecom southwest corner. The width of this 6.7 acres was the extreme width of the Zona Moor tract, that is, 177 varas, and the north and south boundary lines of this 6.7 acres extended west on the north and south boundary lines of the Zona Moor 213.69 varas for the northwest and southwest corners of this tract, that is, it extended this distance on the calls for distance, but there were other calls making the location of the west boundary line an issue. This lease was transferred to the Higgins Oil & Fuel Company, and will be referred to as the Higgins lease. The three tracts just named, that is, the Canter tract, the Mecom tract, and the Higgins tract, by their calls tied to the west boundary line of the Stengler tract and consumed 574.39 varas off the eastern end of the north and south boundary lines of the Zona Moor, extending that distance west from the west boundary line of the Stengler 50 acres.

Calling for the west boundary line of the league, Taylor for himself and wards executed a lease to Bevers on a tract of 20 acres of the Zona Moor, being the width of the Zona Moor, that is 177 varas, calling for the west boundary line of the league, and extending east from the west boundary line of the league with the north and south boundary line of the Zona Moor 637.8 varas for its northeast and southeast corners and east boundary line. After making the Bevers

lease, Taylor for himself and wards leased a tract of 10 acres to Christian, with its southwest corner in the south boundary line of the Zona Moor 159.4 varas east of the southeast corner of the Bevers tract. From that point the south boundary line of the Christian lease extended east with the south boundary line of the Zona Moor tract 318.9 varas for its southeast corner, then north at right angles with its south boundary line across the Zona Moor to its north boundary line 177 varas for the northeast corner, thence west with the north boundary line of the Zona Moor 318.9 varas for its northwest corner, thence at right angles with its north boundary line across the Zona Moor tract 177 varas to the place of beginning. By its calls this tract must be located in reference to the Bevers tract. This lease passed to the Houston Production Company, and was owned by it at the time of the trial, and will be referred to as the Houston Production Company lease. There was left between the Bevers tract on the west and Houston Production Company tract on the east a tract of 5 acres, being of the width of the Zona Moor and 159.4 varas long. This was sold in fee by Taylor and his wards to Noble. By their calls for distance the three tracts just named on the west end of the Zona Moor, that is, the Bevers tract, the Houston Production Company tract, and the Noble tract, consumed 1,116.15 varas off the west end of the north and south boundary lines of the Zona Moor tract, extending east that distance from the west boundary line of the league. These calls for distance of the three tracts on the east, that is, 574.39 varas, and the calls for distance of the three tracts on the west, that is, 1,116.15 varas, produced a small conflict between the Higgins tract on its west and the Houston Production Company on its east on the theory that the west boundary line of the league is, in fact, only 1,682 varas west of the west boundary line of the Stengler 50 acres. The Houston Production Company tract did not call for the Higgins tract, nor was it by its calls tied to it in any way. The locative calls of the three tracts on the east tied them to the Stengler west boundary line, and the locative calls for the three tracts on the west tied them to the west boundary line of the league. The conflict just suggested between the Higgins lease and the Houston Production Company lease is not an issue in this case.

At a date prior to the inception of this lawsuit, by actual survey, ignoring the locative calls and accepting the call for distance as controlling, the Higgins Oil & Fuel Company fixed its northwest corner in the north line of the Zona Moor tract at a point 574.39 varas west of the Stengler west line. Houston Production Company fixed the west boundary line of the league and its northwest corner at a point 2,213 varas west of the

northeast corner of the admitted location of the Stengler tract, which is the northeast corner of the west one-half of the league. On the calls for distance of the tracts tied to the west boundary line there is, as already said, a small conflict, between the Higgins lease and the Houston Production Company lease. Appellants, on a theory hereinafter explained, fixed the northwest corner of the league at a point 49 or 50 or 51 varas west of the point fixed by the Houston Production Company. On appellant's location of the west boundary line of the league, fixing the northeast corner of the Houston Production Company lease at a point in the Zona Moor north boundary line 1,116.15 varas east of the west boundary line, there is left a strip of unappropriated land 40.46 varas wide between the Higgins lease, on the location fixed by the Higgins Oil & Fuel Company, on the east and the Houston Production Company lease on the west. This narrow strip of land is the land in controversy, and because of oil produced from it is of immense value. On the theory that the six tracts above named did not include this strip of land 40.46 varas wide extending across the distance of the Zona Moor 177 varas, Taylor, for himself and wards, leased it to Mecom, which lease at the time of the trial was owned by Mecom and his associates.

On original submission appellees advanced the proposition that, regardless of where the west boundary line of the league was located, the prior leases and sales made by Taylor covered all of the Zona Moor tract, and that Mecom and his associates acquired nothing under this lease from Taylor and his wards, and, when this suit was instituted, that none of the plaintiffs had such title as would support an action of trespass to try title. We disposed of this proposition by saying that it did not appear, as a matter of law, that this strip was a part of the Higgins lease, and further that we doubted whether the issue was raised. In an argument filed on rehearing, appellants Taylor and his wards and his lessees concede that our conclusion was wrong, saying:

"It is undisputed that the leases made by Taylor and his minor children covered all of the land between the Stengler west line and the west line of the league originally.

"By placing the west line of the league where contended for by appellants the 1,116.15 varas point from the west line falls 40.46 varas west of the Higgins Oil & Fuel Company's northwest corner, or the Higgins west line located on the 574.4 varas point, leaving this strip 40.46 (the land in controversy), and which was originally embraced in the Higgins Oil & Fuel Company's lease from Taylor and his minor children, but which the Higgins Oil & Fuel Company abandoned by locating its lease on the ground at the 574.4 varas point. Thus it is manifest that should the west line be located as contended for by appellants, the title to the 40.45-acre strip rests in Hubert Taylor and his minor children,

the original owners of the land, and that as to this strip the Houston Production Company is a trespasser, and that even had the Higgins Oil & Fuel Company not abandoned this strip by locating its west line at the point 574.4 varas west from the Stengler line, appellants, the original owners and lessors of the land, owning the surface rights and royalty interest in the land, had such an interest therein as would enable him and his children and their vendees to maintain this suit in trespass to try title against the Houston Production Company, a trespasser.

\* \* \*

"For it is apparent, as above set out, that if the west line is located as contended for by appellants, the land in controversy was originally covered by the Higgins lease, but that the Higgins Oil & Fuel Company has elected to locate its lease on the ground at the 574.4 varas point and abandon the strip in controversy, the title to which is in appellants by the record.

\* \* \*

"Appellants contend that the land in controversy was originally covered by the Higgins lease if the west line is located as they contend, but that the Higgins Oil & Fuel Company has located its lease on the ground at the 574.4 varas point, west from the Stengler line, thus leaving the 1.27 acres of land in controversy between the Higgins and Houston Production Company lease and the leases to the west; \* \* \* and appellants, being the original owners and lessors of the land, are entitled to recover the same."

On this statement by appellants, appellees' proposition presents the following question: Appellants having admitted that the land in controversy was originally covered by the Higgins lease, did H. Taylor individually and as guardian, H. Mecom, and the other plaintiffs below, and appellants here, in their action of trespass to try title herein, show such title as entitled them to recover any greater interest in the land in question than was adjudged to them by the judgment of the trial court? In other words, did appellants show such title to the land in controversy as to enable them to maintain this action in trespass to try title?

To present this issue properly, the following additional statement is necessary:

Appellants H. Taylor, for himself and as guardian of his minor children, and H. Mecom and Mecom Oil Company, as plaintiffs, filed their first amended original petition in this cause, upon which they went to trial, upon the 27th day of August, 1923, complaining of Houston Production Company and Higgins Oil & Fuel Company as defendants. Their petition was in the usual form of trespass to try title, alleging ouster as of date the 1st day of January, 1923, and also specially pleading the three, five, and ten years' statutes of limitation. They pleaded that on the day of the ouster they were lawfully seized and in possession of the land in question, holding and claiming the same in fee simple. They described the land in controversy as follows:

"Out of the north one-third of the west one-half of the Jesse Devore league, and out of and a part of the H. D. Moor homestead tract, described by metes and bounds as follows, to wit:

"Beginning at an iron stake for corner set in the north line of the Zona Moor tract as described in a judgment of partition recorded in Book E, page 392, of the minutes of the district court of Liberty county, Tex., in cause No. 3760, entitled Elsie Taylor et al. v. Zona Moor et al., said iron stake being 574.39 vrs. south 80° west from the west line of the J. H. Stengler 50-acre tract of land and from the northeast corner of said Zona Moor track, same being at the location now on the ground of the northwest corner of the land now under lease to defendant Higgins Oil & Fuel Company;

"Thence south 80° west along the north line of the Zona Moor track 40.46 vrs. to a stake for corner, which corner is 1,116.15 vrs. north 80° east from the west line of the Jesse Devore league, same being at the true location on the ground of the northeast corner of land originally leased to L. C. Christian on the 1st day of May, A. D. 1917, now claimed by defendant Houston Production Company;'

"Thence south 10 east parallel with the west line of the Jesse Devore league 177.9 vrs. for corner in the south line of the Zona Moor tract above mentioned;

"Thence north 80° east with the south line of the Zona Moor tract 40.46 vrs. to an iron pipe;

"Thence north 10° west 177.8 vrs. to the place of beginning, containing 1.27 acres of land, more or less."

By its third amended original answer filed the 3d day of March, 1924, upon which it went to trial, the Houston Production Company answered by general demurrer, general denial, and plea of not guilty. It specially pleaded its title under the lease executed by Taylor to Christian, and described the land covered by the lease as it was described in the lease, and in addition described its northeast corner as being a common corner with the northwest corner of the Higgins lease and its east boundary line as being a common line with the Higgins west boundary line. By cross-action, as a part of its answer against the plaintiffs the Higgins Oil & Fuel Company and the other parties to this suit, the Houston Production Company pleaded its title specially, and prayed for an affirmative recovery against them for its interest under the Christian lease and all land described in its amended answer, which, by its terms, tied the land claimed by it to the Higgins lease, thereby including the land claimed by appellants. But in its original and first and second amended answers, the Houston Production Company described the land claimed by it as it was described in the Christian lease under which it held, and pleaded no calls tying it specially to the Higgins lease. By its first amended original answer filed on the 27th day of August, 1923, the Higgins Oil & Fuel Company answered the petition of plaintiffs and the answer and cross-action of the Houston Production Company, disclaiming all right to the land claimed by plaintiffs in their amended petition and the land claimed by the Houston Production Company in its cross-action filed on the 9th day of July, 1923 (which calls did not tie specifically the Houston Production Company lease to the Higgins lease), and by cross-action pleaded its title to the land claimed by it under the Nash lease, fixing its northwest corner on the distance hereinbefore stated. By this plea the Higgins Oil & Fuel Company fixed its northwest corner at a distance of 574.39 varas west of the Stengler west line. This plea and disclaimer affirmatively excluded the strip of land claimed by plaintiffs. By its answers and cross-action the Houston Production Company claimed only a leasehold interest in the land in controversy; conceding to Taylor and his wards their rights as lessors under the Christian lease. The terms of the Christian lease held by the Houston Production Company were identical with the terms of the Nash lease held by Higgins Oil & Fuel Company. Judgment was entered on the 18th day of August, 1924, denying Taylor and the other plaintiffs recovery on their petition, awarding Higgins Oil & Fuel Company judgment for the interest claimed by it in its disclaimer and cross-action and in favor of the Houston Production Company for the land claimed by it in its third amended original answer, tying its lease to the Higgins lease, and making the east boundary line of the Houston Production Company lease a common line with the west boundary line of the Higgins lease. Taylor and his wards, by the judgment, were protected in all their rights reserved under the leases executed by them.

[1] Without quoting from the Higgins lease and the Houston Production Company lease, it is sufficient to say that they constituted a conveyance of the realty, and the estate created by them and conveyed by H. Taylor to his lessees was an estate in realty. These leases, by their terms, come within the construction placed upon oil leases by Waggoner v. Sigler Oil Co. (Tex. Com. App.) 284 S. W. 925; Lambert v. Gant (Tex. Civ. App.) 290 S. W. 550; State v. Hatcher (Tex. Com. App.) 281 S. W. 193; Ferguson v. Steen (Tex. Civ. App.) 293 S. W. 320; Hager v. Stakes (Tex. Sup.) 294 S. W. 842; Stephens ,County v. Mid-Kansas Oil Co., 113 Tex. 160, 254 S. W. 292, where, to quote the language of State v. Hatcher, the estate was thus defined:

"It is well settled by the decisions of our Supreme Court that oil is a part of the land and can be sold in place. Not only so, but it is. equally well settled that the ordinary form of oil lease in general use is, in effect, a sale of a portion of the land."

[2-4] It is also well settled that such leases create a severance of the estate in the surface from the estate in the oil and minerals, which may be owned in their entirety by different parties. Henderson v. Chesley (Tex. Civ. App.) 229 S. W. 573; Wallace v. Hoyt

(Tex. Civ. App.) 225 S. W. 425; Green v. West Texas Coal Mining & Development Co. (Tex. Civ. App.) 225 S. W. 548; Luse v. Parmer (Tex. Civ. App.) 221 S. W. 1031; Lyles v. Dodge (Tex. Civ. App.) 228 S. W. 316; Hager v. Stakes, supra. It is also the law of this state that the royalty interest retained by the lessor under such leases, whether owned by the original lessor or his vendees, is an estate in the land to be held and sold only under the laws regulating the sale of land. Hager v. Stakes, supra. Under that proposition H. Taylor and his wards owned the estate in the surface and were tenants in common with the Higgins Oil & Fuel Company and Houston Production Company in the estate in the oil and other minerals. In Ferguson v. Steen, supra, it was said:

"The effect of the leases executed by appellants to the lessees in this case was to sever said minerals in or under said land from the remainder of the land, and to, in substance, vest in said lessees seven-eighths of said minerals, and, in effect, leaving in appellants, severed from the remainder of the land and subject to sale and separate taxation, one-eighth or royalty interest in said minerals, to be delivered when mined and brought to the surface."

[5] When Taylor and his wards and Mecom instituted this suit they had no interest in the land in controversy except such as was reserved to them under the Higgins lease, since the land in controversy, on their theory of the location of the west boundary line, was a part of that lease. Recognizing that the land in controversy was covered by the Higgins lease, appellants assert that they reacquired the absolute title, and on such title could maintain this suit:

(a) By the act of the Higgins Oil & Fuel Company in locating its northwest corner and its west boundary line at a point which excluded this land. This proposition is not sound. The Higgins lease was a valid lease, and the holders under it were in the faithful discharge of its burdens and the enjoyment of its rights. No act of forfeiture had been committed and none was claimed. Appellants' proposition is based on their conclusion that the fixing of the west boundary line by the Higgins Oil & Fuel Company constituted an abandonment of title to both the surface and minerals and reinvested Taylor and his wards with that title. This conclusion is not sound. In Hanrick v. Dodd, 62 Tex. 90, it was said:

"A title which had vested could not be divested by a mere declaration of abandonment."

Defining the interest conveyed by an oil lease and the proper manner of transfer, it was said in Lambert v. Gant, supra:

"It is now an established rule in this state that gas and oil in place constitute real property and as such is subject to ownership and conveyance in accordance with the rules regulating the ownership and conveyance of that class of property" (citing Texas Co. v. Daugher-

ty, 107 Tex. 226, 176 S. W. 717, L. R. A. 1917F, 989, and Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S. W. 290, 29 A. L. R. 566).

Defining "abandonment" as that term is used in connection with an oil lease and holding that the title vested under an oil lease cannot be abandoned, it was said in Waggoner v. Sigler Oil Company, supra:

"It must be borne in mind that by the term 'abandonment' in this connection is not meant the relinquishment of title to real estate once fully vested. This would be an inaccurate use of the term. A vested title to real estate can only pass by deed, judgment, or other means recognized by law. Abandonment, as such, of title is not recognized in this state. What is meant is most fully explained in the group of cases we have been discussing. Abandonment in that connection pertains to the enterprise or business, upon the existence of which the continuance of title depends. There it is an incident determining title, but not an act passing title."

Under these authorities the Higgins Oil & Fuel Company by fixing its west boundary line did not reinvest the Taylors with title to the excluded land.

[6, 7] (b) Appellants say the disclaimer filed by Higgins Oil & Fuel Company reinvested them with title sufficient to sustain this suit. This proposition is not sound. The disclaimer vested appellants with no title or interest not owned by them at the time they filed their suit. The legal effect of a disclaimer is merely that of an estoppel against the party filing it, and is not an affirmative grant of title to any one. The title under disclaimer only passes by virtue of the judgment. The Houston Production Company was a party defendant claiming this land by metes and bounds, and appellants could prevail as plaintiffs in trespass to try title only upon an affirmative showing of title. In Phillips v. J. B. Watkins, etc., Co., 90 Tex. 202, 38 S. W. 270, 274, it was said:

"The disclaimer of Phillips does not vest title in the estate of Blasingame. In order to have that effect, if title was ever vested in Phillips, there must have been some act on the part of Phillips which would be held good as a conveyance of land. If the sale by the trustee was regular and vested the legal title to the land in R. G. Phillips, his subsequent abandonment or disclaimer could not re-vest the title in the estate of Blasingame so as to prevent appellant from foreclosing its mortgage on the land."

[8] (c) The title to the surface rights reserved by Taylor and his wards as lessees, which they owned at the time the suit was instituted and their interest in the mineral rights reserved by the terms of the lease which they owned at the time of the institution of this suit, were sufficient to support their action in trespass to try title. On the location of the west boundary line of the league contended for by appellants, the land

in controversy was not a part of the lease of the Houston Production Company. Therefore, as against that location, this company was a mere trespasser. Appellants were the owners of the surface rights and entitled to protection in their possession against all persons except those claiming under the Higgins lease. That the Houston Production Company conceded to appellants all rights reserved by that lease could not give them an entry upon appellants' land. This company could enter upon that land only as a naked trespasser. Having the right of possession against all the world except those holding under the Higgins lease, appellants could appeal to the courts to protect them in that right. The Houston Production Company could not invade their possession except by a wrongful act. Therefore, as the owners of the surface rights, appellants could maintain this action in trespass to try title against a mere trespasser.

[9] (d) Again, appellants were tenants in common with the Higgins Oil & Fuel Company under the Higgins lease in the mineral rights on this land. Therefore, being tenants in common and owning the mineral estate in common with the Higgins Oil & Fuel Company, appellants could maintain their action against a naked trespasser and against such a trespasser recover the possession of the whole estate in the minerals. In Boone v. Knox, 80 Tex. 642, 16 S. W. 448, 26 Am. St. Rep. 767, it was said that the true principle seems to be that each tenant in common is entitled to the enjoyment of the entire premises undisturbed by any one except his cotenants, and therefore he should have the right to dispossess a stranger to the title. Again in Keith v. Keith, 39 Tex. Civ. App. 363, 87 S. W. 384, and Hooper v. Hall, 30 Tex. 158, the question was decided on the proposition that one cotenant may maintain an action for possession against a trespasser, and the recovery inures to the benefit of the other cotenants. In McDonald v. Hamblen, 78 Tex. 628, 14 S. W. 1042, it was held in trespass to try title by a cotenant against one claiming adversely under a tax deed that it is immaterial that the portion owned by the cotenant is identified in his conveyance by a particular description.

[10, 11] The general rule is that one of several tenants in common may maintain an action to recover the whole of the land from a person having no title. Hutchins v. Bacon, 46 Tex. 408; Bounds v. Little, 75 Tex. 316, 12 S. W. 1109; Louder v. Schluter, 78 Tex. 103, 14 S. W. 205, 207; Snow v. Starr, 75 Tex. 411, 12 S. W. 673. That appellants pleaded an ownership of the entire fee and the evidence showed them tenants in common in the mineral estate did not constitute a variance. Hutchins v. Bacon, supra. Therefore, having title to an undivided interest in the estate in the minerals on their theory of the location of the west boundary line, appellants

could maintain this suit, since on that theory the Houston Production Company was a mere trespasser. Steddum v. Kirby Lumber Co., 110 Tex. 513, 221 S. W. 920; Land v. Banks (Tex. Com. App.) 254 S. W. 786, 30 A. L. R. 1. This proposition in its ultimate legal effect was before the federal courts in Associated Oil Co. v. Miller (C. C. A.) 269 F. 16, where it was held that the lessor under a mineral lease was a necessary party in a suit in equity.

[12, 13] Against the conclusion just expressed, the Houston Production Company advances the further proposition that it was awarded judgment against the Higgins Oil & Fuel Company on its disclaimer for the land in controversy, and therefore having judgment for the identical land in controversy, against the record owner of that interest, it is not now a trespasser, but a tenant in common with the Taylors, and not subject to ejectment by them. We understand the law to be that the successful party in trespass to try title recovers his adversary's title as fully as if by voluntary conveyance. It is not a mere extinguishing of the enemy title, but a recovery merging the title recovered with the successful title. Campbell v. McLaughlin (Tex. Civ. App.) 270 S. W. 257. Therefore, if appellee have a valid judgment against the Higgins Oil & Fuel Company for this land, it owns now the interest formerly owned by the Higgins Oil & Fuel Company, and can avail itself of that chain of title, which, of course, vests in it the particular interest in litigation, subject to such rights as the appellants were entitled to on the pleadings. But the judgment in favor of the Houston Production Company against the Higgins Oil & Fuel Company, based upon the disclaimer filed by the Higgins Oil & Fuel Company, was without support in the pleadings. The Higgins Oil & Fuel Company disclaimed specifically as to the land claimed by the Houston Production Company under the description given by Taylor in his lease to Nash. At no time did the Higgins Oil & Fuel Company, by its answer or disclaimer, attempt to enlarge the extent of the claim of the Houston Production Company, nor did it file any pleading to the effect that it disclaimed in favor of the Houston Production Company all land lying west of its west boundary line. The disclaimer in terms was in favor of Houston Production Company for the land claimed by it, which at the time the disclaimer was filed was limited by the description given in the original lease. In addition, this company disclaimed in favor of the plaintiffs for the land claimed by them by the metes and bounds of their petition. The judgment on the disclaimer in favor of the Houston Production Company against the Higgins Oil & Fuel Company was without support in the pleadings, and, there being a disclaimer in favor of the plaintiffs, it was fundamental error for the court to refuse the plaintiffs judgment on that disclaim-

er. In Snyder v. Compton (Tex. Civ. App.) 29 S. W. 73, it was said:

"A disclaimer is an admission upon the record of the plaintiff's right, and a denial of the assertion of title on part of the defendant. Herring v. Swain, 84 Tex. 523, 19 S. W. 774. The judgment of the court should have been for the plaintiff for all of the land sued for as to which the defendant disclaimed; and the failure to render such judgment constitutes fundamental error."

[14] We then have this situation. As between the three parties just named, the judgment in favor of the Houston Production Company on the disclaimer of the Higgins Oil & Fuel Company cannot extend beyond the field notes of the original lease, and the plaintiffs should have judgment on the disclaimer in their favor for all land not included within the boundaries of the Higgins Oil & Fuel Company and excluded by the disclaimer of the Higgins Oil & Fuel Company from its lease. It is true, as asserted by the Houston Production Company, that the Higgins Oil & Fuel Company made no complaint in the trial court and makes no complaint here against the judgment on the disclaimer carrying its field notes to the west boundary line of the Higgins lease. But that does not strengthen the position of this appellee. The disclaimer did not vest title which could only follow a judgment of the court. The judgment of the court can have no support unless the issue is raised by the pleadings. Since by its pleadings the Houston Production Company did not claim this land in controversy as against appellants' theory of the location of the west boundary line, it has no judgment for this land based on the disclaimer. Etter v. Dignowity, 77 Tex. 212, 13 S. W. 973.

[15] The Houston Production Company claims this land by estoppel. The chain of title under which appellants hold by numerous deeds makes the north boundary line of the H. D. Moor tract and of the three subdivisions of that tract 1,682 varas long. Since the Stengler tract was surveyed out of the northeast corner of the north third of the west half of the league, the northwest corner of that tract has been treated by all the owners of the land between its west boundary line and the west boundary line of the league as being 1,682 varas east of the northwest corner of the league. Without further naming the deeds, it is sufficient to say that this statement appears many times. Taylor did not know where the west boundary line of the league nor its northwest corner was situated on the ground. It was not shown that any of his privies in title ever made any specific representation as to the location of this line and corner. None of them had the west boundary line of the league surveyed, nor did any of them take their vendees upon the ground and point out any specific location. Their acts went no further than to make

their north boundary line 1,682 varas long, and this call for distance was limited by a call for the west boundary line of the league. These facts do not raise the issue of estoppel against Taylor. Timon v. Whitehead, 58 Tex. 290; Hefner v. Downing, 57 Tex. 580; Davis v. Smith, 61 Tex. 18; Land Company v. Gardner (Tex. Civ. App.) 25 S. W. 738; Asher v. Johnson (Ky.) 99 S. W. 282—cited by the Houston Production Company, are in no sense in point on these facts. The estoppel in those cases was based upon some affirmative act, as for instance, in Timon v. Whitehead, "the conduct of Young in having his land resurveyed"; in Hefner v. Downing, an agreement "implied from the acts and long acquiescence of the parties in regard to a boundary line"; in Land Company v. Gardner, the appellant "sent its surveyor to establish and identify the south line of its block No. 2"; in Asher v. Johnson, it was said:

"The calls in the deeds executed on their behalf showed that the lines of the deeds were actually run out on the ground, and that the closing line, where it called for the Hamilton B. Hampton 850-acre plat, and called to run with it, is shown to have been then surveyed and corrected. * * * If the parties in fact believed when the deeds were executed that it was elsewhere, and surveyed and sold the land to the supposed line, then the supposed line will control, instead of the actual line of that patent."

The facts of the cases cited are not the facts of this case. No line was shown upon the ground, and appellants made no representation as to its location, other than by a call for distance, which, as we have just said, was modified by the additional call for the west boundary line. A further discussion of this subject will be found in Marshburn v. Stewart (Tex. Civ. App.) 295 S. W. 679.

[16] This brings us to the third proposition upon which the Houston Production Company asks us to affirm the judgment of the trial court instructing a verdict in its favor, that is, that upon the undisputed facts of this case the west boundary line of the league and its northwest corner were in fact located upon the ground 1,682 varas west of the northwest corner of the Stengler tract; that is, 2,213 varas west of the northeast corner of the Stengler tract, being the northeast corner of the west half of the league. As already said, this league was surveyed in 1835, under the following field notes:

"Jesse Devore Title, June 20/35, Vol. 20, p. 575, Liberty Co., Notes.

"A mound and post at the beginning of Jesse Devore's survey in large prairie about 10 miles E. of the River Trinity and 200 varas S. of the road leading from Atascosito to the pine Island in a marsh called little Willow Marsh the same being the S. E. corner of Phillip P. Dever's survey.

"Thence N. 10 deg. W. with the eastern boundary of said Dever's survey 4200 varas, made a mound and set a post in same little Willow Marsh."

From the northwest corner the call was north 80° east 4,426 varas for the northeast corner; thence south 10° east 5,648 varas for the southeast corner; thence south 80° west 4,426 varas for the southwest corner; "thence north 10° west on random line 1,440 varas, fell 30 varas west of place of beginning S. 8° 48' E. on true line 1,440 varas to the fourth corner, containing four labors of arable land and the balance grazing land. May 25, 1835. Franklin Hardin, Survyr."

Devore sold to other parties the western half of the league, which was set apart to them by a surveyor named Jackson, who divided the league into east and west halves by running a dividing line from the north boundary line across the league to the south boundary line. By his calls this line began on the north boundary line 2,213 varas east from the northwest corner of the league. At the time he divided the league into east and west halves, he divided the west half into thirds, and the following are the field notes made by Mr. Jackson for the north one-third, which includes the land in controversy:

"Survey for John Fowler of 738 acres of land being a part of the west half of a league of land titled to Jesse Devore, beginning at the N. E. corner of said west half of said Devore league a post for corner; thence S. 9¾° E. with the east line of said half league 1,882 varas corner a stake in a point of timber from which a red oak 30 in. dia. mkd. 'X' bears N. 52½° W. 9 vrs.; thence S. 80¼° W. 2,213 varas intersected the west line of said league a stake in the marsh; thence N. 9¾° with said line to the N. W. corner of said league a post in large marsh; thence N. 80¼° E. with the north line of said league 2,213 vrs. to the beginning corner."

This northeast corner of the west half and northwest corner of the east half, as we have already said, is a well-recognized corner on the north boundary line of the league, and its location on the ground was conceded on the trial. This corner is also, as we have said, the northeast corner of the Stengler tract. The division line running south from this corner is the east boundary line of the Stengler tract. The location on the ground of all lines and corners of that tract was conceded. There was no controversy as to the location on the ground of the division line run by Jackson from the north boundary line to the south boundary line. The south one-third was conveyed to Pounds, and the northwest corner of that one-third was shown by general reputation, and at that northwest corner was shown an old stake which by general reputation was placed there by Jackson in 1854, and the general reputation was that Jackson placed this stake in the west boundary line of the league. The original northeast corner of the league was shown without controversy, and the location of the north boundary line of the league was shown without controversy from the northeast corner west through the middle division corner, which is the northeast corner of the Stengler tract, on further west for a considerable distance towards the northwest corner. There were no marks on the ground further identifying the southeast corner, the south boundary line, or the southwest corner. In other words, no witness testified that he ever saw any of the identifying calls made by Hardin in 1835, nor did any surveyor identify any old marks as having been made by Hardin in 1835. The Houston Production Company would locate the northwest corner of the league by running the recognized north boundary line from the northeast corner of the league through the middle division corner in the north boundary line on the course of that line as it is now recognized, 2,213 varas from the middle division corner, and at that point establish the northwest corner of the league. On the theory that the stake at the Pounds northwest corner is in the west boundary line of the league, appellants would extend the line north and south through that corner upon the course called for in the original grant north to its intersection with the extension of the north boundary line upon its actual course. So running, the west boundary line and the northwest corner would be established at such a place as when the three western subdivisions of the Zona Moor tract are tied to the west boundary line of the league, there would exist the tract of land in controversy. We quote as follows from an argument of appellants, giving a summary of the facts upon which they rely:

"Let us consider the case upon its exact status before this honorable court, bearing in mind that the plaintiffs were entitled to have every issue supported by any evidence submitted to the jury and have the jury weigh the evidence and pass upon the facts.

"The record is so voluminous we will not undertake to make an extended statement, but will briefly marshal the most potent facts and circumstances supporting plaintiffs' theory that the Pounds corner is in the west line and that the west line of the league is a line extended north 10° or 10°/25' west through the Pounds corner on such variation as to make same parallel with the east line.

"It also will assist the court if we bear in mind that every issue properly raised, so far as this appeal is concerned, may be assumed to have been found in favor of the plaintiffs by jury.

"The league was located in 1835 by Franklin Hardin, whose field notes on their face show, since the survey did not close, that there was a mistake in its measurements.

"The location of the northeast corner is admitted.

"The location of east line is admitted, or certainly, at least, position of its location is raised by the evidence; as likewise, the southeast corner; that the survey by these locations is short north and south about 91 varas; that the west one-half was sold by Jesse Devore to

Franklin Hardin and Swinney in about 1842 or 1843; that in 1854 Hugh Jackson, county surveyor of Liberty county, divided the west one-half into thirds; east and west; that he established the middle or division line and left a stake at the northeast corner of the north third in the true north line of the league, and a stake at the northwest corner of the south third (Pounds corner), claimed to be in the west line of the league and which should have been so set in dividing the league in three parts, east and west.

"The evidence shows: That Jackson, in dividing the west half into thirds, established the middle division corner on the north line at a point. which is 2,234.7 varas west from the recognized northeast corner. The field note calls in the patent of the north line of the league is 4,426 varas, one-half of which is 2,213 varas. That in running out the north third, he ran down this middle division line to a corner which distance he calls to be 1,882 varas, marking a red oak which is now the southeast corner of the Calvin Smith 127-acre tract, as shown on the plat and is generally recognized as the northeast corner of the middle third and the southeast corner of the north third. The actual distance on the ground is 1,908 varas instead of 1,882 varas as recited by Jackson.

"He measured down from this red oak corner for the middle third 1,915 varas. This point is the southeast corner of the Carr 65-acre tract shown on the plat and is well recognized and undisturbed. This distance as called in the field notes is either 1,880 or 1,890 varas, when in truth and in fact it is 1,915 varas on the ground.

"From this point—that is, the southeast corner of the middle third—a line run thence west along the south line of the middle third, as recognized by all parties claiming in the league, intersects the west line at the Pounds northwest corner, at the old cypress stake. All parties claiming in the league have respected these subdivisions.

"In 1861, A. N. B. Thompkins, county surveyor of Liberty county, divided the middle third and left a plat and field notes calling for a stake in the marsh at the southwest corner of the middle third, which is the northwest corner of the Pounds. No evidence of any stake or any line or any mark remains to mark this work except the Pounds northwest corner, the old cypress stake, which is taken now and always has been as the southwest corner of the middle third.

"H. H. Devers, the son of the original P. P. Devers, the patentee of the P. P. Devers league, which lies at the southwest corner of the Jesse Devore, and who lived in that vicinity, was chain carrier for A. N. B. Thompkins when he run out the middle third.

"This same H. H. Devers pointed out to the surveyor Jas. F. Weed in 1890, the stake as having been set by Jackson in locating the northwest corner of the Pounds or south third and the southwest corner of the middle third.

"Jas. F. Weed, a state surveyor, for whose reputation and ability this honorable court vouches, was appointed by the land commissioner of the state of Texas to make a resurvey of the Jesse Devore league and surrounding surveys in 1890. That he resurveyed and located the line of the league at the place contended for by appellants, the west line being through the Pounds corner.

"That he made a map of his work and certified it to the land commissioner, and said locations were accepted by the state and have been acted on by the state ever since.

"That practically all surveyors surveying on said Jesse Devore league have accepted the work done by Weed. Weed makes this statement: 'I would make no change in the lines then found marked on the ground and accepted by me as the true boundary of the Jesse Devore league because no new facts have been presented to me.'

"All adjoining surveys have been patented by the state in recognition of the lines as established by Weed.

"The old marks, some 60 years old, found in the timber along the west line north of the southwest corner; no marks found at any other place in said timber.

"Jones, county surveyor, surveyed the league in 1870 or 1871 and Geo. Hilliard assisted him. He ran from the Pounds corner found old marks along the west line and the south line and a blazed stake at the southeast corner and at the northwest corner Hilliard testified that he found an old rotten persimmon stake and ran south from the stake and struck the Pounds corner.

"Numerous witnesses testified to the reputation of the Pounds stake being in the west line of the Jesse Devore league.

"That the position of this line through the Pounds corner gives the league substantially its acreage.

"P. G. Omohundro, surveyor, states:

"'To extend a line north from the Pounds corner on the same variation and parallel with the east line, to an intersection with the north line, as I run it, would fall about a vara, I guess, west of the galvanized pipe. Such a line would be 1,731 varas from the west line of the Stengler.'

"The appellees' witness, Partlow, states that he ran the east line south 10° 25′ and that the original field notes of Mr. Hardin were that the east line and west line would run on a 10-degree angle.

"Partlow, appellees' witness, testified as follows:

"'If you were to start at the Pounds corner and run north 10° 25′ west, parallel with the east line, using the same variation that I used on the east line, you would miss the iron pipe up there at the northwest corner two varas. [Corner contended for by appellants.] So, substantially, if I had run from the cypress stake and run the west line on the same angle and variation that I ran the east line, I would have practically hit the iron stake for the northwest corner that you have been talking about.'

"And again this witness of appellees states:

"'I have always accepted that as the northeast corner, and that stake that he [Weed] established there as the southeast corner' [of the league].

"So the line run through the Pounds corner parallel with the east line as established by the evidence and taken by all the surveyors places the west line and the northwest corner at the point contended for by appellants.

"Jackson's instrument was so .set that this line run 9° 45′; Omohundro's so set that it run 10° 32′; Partlow's and Compton's so set that it run on 10° 25′, and Hardin's so set that the line run 10° even. However, each of these de-

gree readings on the individual compass will run the west line parallel with the east line.

"The fact that the Pounds corner is only 318 varas north from the original beginning corner of the Devore league set by Hardin, a stake in the mount 200 varas south of the Atascosita road, and that Jackson set his stake just 19 years after Hardin's work and with the evident purpose of setting it in the west line, which reputation it has borne ever since.

"That the post and mound were in existence, and that Jackson probably knew their location when he set the Pounds stake."

Appellants' theory that the northwest corner of the league as located by plaintiffs was 50 varas west of the western terminus of the 2,213-vara line was not developed until the land in controversy became of great value. Prior to that date Taylor, though not knowing the exact location on the ground of this northwest corner, had thought that his line, in fact, was only 1,682 varas long, and when he subdivided the Zona Moor tract, as detailed, supra, thought he had leased all the land owned by him on that tract. The attorney for Mecom, in explanation of his opinion upon which Mecom purchased the lease in controversy, testified:

"I think I did know at that time that he was building a lawsuit, and that I did agree to take care of it."

The witness James Weed, referred to in the statement we have taken from appellants' argument and upon whose work their case must primarily rest, testified:

"The west line of the Devore as adopted depends for its location on: (A) The northwest corner of the Pounds tract, said to have been placed by Hugh Jackson in 1854, and by old line marks through the large island of old timber north of the southwest corner. Whether Mr. Jackson found any original marks in said island or some subsequent surveyor found such, I do not know. I found some very old marks, several sets of them, there in 1890, and some of them quite old. There are now only two or three trees bearing old marks in said island, but I consider that long recognition of the Pounds corner, backed up by the old marks found in said island of timber, sufficient to justify me in accepting the line, although such action causes an excess of about 60 varas the width of the Devore. Its length, however, is short about 80 varas, so that its area is practically as called for. Woldert and Tanner accept the west line as O. K., though there is less evidence to support the west line than there is to support either of the other lines."

[17-19] On the facts summarized, we believe the court correctly instructed a verdict in favor of Houston Production Company on its conclusion that, as a matter of law, the northwest corner of the league is properly located on the ground at a distance of 2,213 varas on its proper call from the northeast corner of the Stengler tract. It is the law of Texas in locating disputed boundary lines that preference must be given to the calls of

the original grant, which in their application to the particular facts in issue are more specific and definite in preference to others merely general and indefinite or descriptive. Finberg v. Gilbert, 104 Tex. 546, 141 S. W. 82. The conclusions of a wise jurisprudence are that calls are of primary importance in the following order: (1) Natural objects; (2) artificial objects; (3) course; (4) distance. The reasons of the law that gives dignity to calls in the order named are given by the court in Stafford v. King, 30 Tex. 257, 94 Am. Dec. 304. But this rule is not absolute in its application, and must yield to the general and broader principle reannounced in Finberg v. Gilbert, supra. This rule is well stated as follows by appellants:

"Every rule of evidence laid down for guidance in boundary questions is for the purpose of ascertaining the true location of the line in dispute, by which is meant the place at which the original surveyor ran the line. After 90 years have elapsed and time has destroyed in large measure the evidence left by the original locater, it is then permissible, not only permissible, but of necessity is required, that we resort to any evidence tending to establish the place of the original footsteps which meets the requirement that it is the best evidence of which the case is susceptible."

[20-22] By the "best evidence," in its application to a boundary issue, is meant that evidence which is the more specific and definite as against that which is merely general and indefinite or descriptive. This may be a question of fact for the jury, or one of law for the court. It is always a question of law when upon the particular facts of the case the rule announced in Stafford v. King is controlling. It also becomes a question of law when that rule has no application, but when upon the particular facts reasonable minds cannot differ as to the conclusions legally deducible from the facts. Southwestern Settlement & Development Co. v. Stanberg (Tex. Civ. App.) 248 S. W. 108. When one theory of the case is supported by specific and definite facts, while the other is supported by evidence merely general and indefinite or descriptive, the issue is one of law for the court and not of fact for the jury. Williams v. Winslow, 84 Tex. 371, 19 S. W. 513; Hamilton v. Blackburn, 43 Tex. Civ. App. 153, 95 S. W. 1094; Sloan v. King, 33 Tex. Civ. App. 537, 77 S. W. 48; Thompson v. Langdon, 87 Tex. 254, 28 S. W. 931; Williams v. Beckham, 6 Tex. Civ. App. 739, 26 S. W. 652; Matador v. Cassidy (Tex. Civ. App.) 207 S. W. 430; Finberg v. Gilbert, supra. What are "natural" and "artificial" objects, as those terms are used in the general rule, has been defined in our jurisprudence. Maddox v. Fenner, 79 Tex. 291, 15 S. W. 237, and Fagan v. Stoner, 67 Tex. 286, 3 S. W. 44, define an unmarked line as an artificial object. But "a call for the line of an adjoining survey should not be

permitted to prevail over a call for distance, unless such line itself can be located with reasonable accuracy and certainty." Hermann, v. Thomas (Tex. Civ. App.) 168 S. W. 1048; Polk County v. Stevens (Tex. Civ. App.) 143 S. W. 204; Bigham v. McDowell, 69 Tex. 100, 7 S. W. 315; Braumiller v. Burke, 112 Tex. 387, 247 S. W. 501; Duff v. Moore, 68 Tex. 270, 4 S. W. 530; Stein v. Roberts (Tex. Civ. App.) 217 S. W. 166.

[23-25] Where the natural and artificial objects of the original grant cannot be identified upon the ground, the location of the lines and corners will be controlled by course and distance from the nearest recognized and established corner or artificial object with which the field notes connect. State v. Talkington, 274 S. W. 316; Petty v. Paggi, (Tex. Com. App.) 254 S. W. 565; Standefer v. Vaughan (Tex. Civ. App.) 219 S. W. 484. In the application of the rule just announced, the "corner" and "object" referred to mean the "corner" and "object" of the original grant, and it is the rule that calls for corners and objects made in subdividing the original grant do not prevail in locating the steps of the original surveyor. State v. Dayton Lumber Company, 108 Ark. 270, 157 S. W. 391; Petty v. Paggi, supra; Thompson v. Langdon, 87 Tex. 254, 28 S. W. 931; Davis v. Smith, 61 Tex. 21; Polk v. Reinhard (Tex. Civ. App.) 193 S. W. 687; Reast v. Donald, 84 Tex. 648, 19 S. W. 795. But such calls in a subdivision, as well as the calls of junior surveys, may be admissible and under certain circumstances controlling. If in making a subdivision of an original grant the surveyor found upon the ground the natural or artificial objects called for by the original surveyor, which subsequently disappeared, and in making the subdivision he called for such original objects and made them a part of his work, tying his work to such objects, and in his work established new corners upon the original lines of the survey, such corners assume the dignity of original calls in locating the original corners and lines upon which these inside calls were based, when it is shown that the surveyor who made them is dead. State v. Dayton Lumber Company, supra. In Runkle v. Smith, 63 Tex. Civ. App. 549, 133 S. W. 745, discussing the dignity to be given an object found at the northeast corner of the land in controversy, it was said:

"It was the evident purpose of appellee to have the jury believe that this rock pile was made at said place for the northeast corner of the Lampasas county school land; otherwise it would have been wholly irrelevant and immaterial. If it was made there for that purpose, it is wholly irrelevant and immaterial, unless it was placed there by the surveyor who made the original survey, *or by some one who knew that it was at the corner of said survey*." (Italics ours.)

The proposition announced has its basis, of course, only in the theory that reasonable minds could not differ as to the conclusions to be drawn from the facts stated.

Now, let us apply the rules discussed to the facts of this case. There is nothing at the southwest corner or on the west boundary line or at the northwest corner of the league to identify the calls made by Hardin in his field notes of 1835. All artificial objects have disappeared. The southeast corner of the Devers survey and its east boundary line called for in the original grant are uncertain and indefinite in their location, and there is no trace of the Atascosita road. Therefore the call for them is without probative force. The original field notes made the north boundary line of the league 4,426 varas long. One-half of that distance is 2,213 varas. In the north boundary line of the league exists and was shown without controversy the northeast corner of the Stengler tract, which was accepted by all parties as being in the north boundary line, run by Jackson in 1854. It was Jackson's duty to divide the league into east and west halves. He could do this only by an actual survey if as a part of his work he was to establish the corners and lines upon the ground. Since it is admitted that he did, in fact, establish a corner on the north boundary line and in fact ran the division line, it must appear as a legal conclusion that Jackson went upon the land and in fact surveyed off the west half of the league. He said he did that. In his calls for the west boundary line and the north boundary line and the northwest corner of the league, he said:

"Thence south 80¼ west 2,213 varas intersecting the west line of said league a stake in the marsh; thence north 9¾ degrees with said line to the northwest corner of said league at post in large marsh; thence north 80¼ degrees east with the north line of said league 2,213 varas to the beginning."

[26] As his work was done only 19 years after the original work, a presumption arises that he found Hardin's stake at the northwest corner. Thatcher v. Matthews, 101 Tex. 122, 105 S. W. 317.

Not only can we indulge that presumption, but on rehearing appellants concede "that Jackson most likely saw Hardin's stake in the northwest corner, if he, Jackson, went out there, is beyond question." However, they qualify this admission, saying, "But that he measured the distance back to his division corner is most unlikely." Appellants' qualification of their admission is without force. Jackson had to locate a division corner in the north boundary line. Certainly, he did not measure from the northeast corner, because he made no call for that corner, was not interested in the east half, and, in fact, the distance from the admitted division corner on the north boundary line to the north-

east corner is more than 2,213 varas. It follows as a conclusion of law from these facts that Jackson, in 1854, was at the northwest corner of the league, found the original stake left there by Hardin in 1835, and from that corner actually measured the distance of 2,213 varas on the original north boundary line for the division corner of the west one-half. It follows as a conclusion of law that he arrived at the distance of 2,213 varas by taking one-half of the call for distance as given in the original calls by Hardin and did not measure the entire distance of the north boundary line, since the distance from the division corner to the northeast corner of the league was more than 2,213 varas. The northwest corner has disappeared. While the division corner in the north boundary line was the work of an inside survey, and is not the result of Hardin's work, under the propositions above announced it has the dignity of an original call. The location of the northeast corner was conceded. The location of the north boundary line from the northeast corner west through the middle division corner and for a considerable distance west towards the northwest corner was conceded. This line was shown upon the ground. The calls for natural and artificial objects having disappeared, and the location of the north boundary line upon the ground being shown without controversy to the extent just stated, the location of the northwest corner at the place contended for by appellee was a simple problem of measuring the distance of 2,213 varas west from the middle division corner upon the actual course of the north boundary line as it was found upon the ground. No question of compass variations enters into this work. Jackson reported a variation of three-fourths of a degree from Hardin's calls. That presents no difficulty in running the north boundary line, since its location is shown upon the ground, and all the surveyor would have to do would be to get upon the line at the middle division corner and follow it west 2,213 varas on its true course and there establish his northwest corner. No issue could arise that he was on the north boundary line. The only issue is where to stop the extension of that line, and the law, on the principles we have announced, stops him at the distance of 2,213 varas from the division corner.

As further supporting our conclusion, in Guill v. O'Bryan (Tex. Civ. App.) 121 S. W. 593, it was said:

"It is a settled rule of law in determining the true dividing line between surveys, as in this case, that if from a definite beginning point course and distance alone will with reasonable certainty locate and identify the line, as in this case, that will be held sufficient. Course and distance will control, then, under the surrounding and connecting circumstances. They are the most certain and reliable evidences of the true locality of the grant."

Our conclusion has additional support in the fact that "it is the least remote of all the points from which it is sought to locate" the northwest corner. Petty v. Paggi (Tex. Com. App.) 254 S. W. 565; Clarke v. Klein (Tex. Civ. App.) 166 S. W. 1179; Standefer v. Vaughan, supra.

Against the conclusion we have reached, appellants say that the facts and circumstances summarized by them were sufficient to take the case to the jury. Let us examine appellants' facts. Their theory of the case rests primarily upon the stake at the Pounds northwest corner. In fact, Mr. Weed, their surveyor, said:

"The west line of the Devore as adopted depends for its location on the northwest corner of the Pounds tract," etc.

That stake, then, is the keystone of appellants' case. Admittedly it was not the work of Hardin in 1835, but of Jackson in 1854. There was nothing on the ground at that point to mark the line made by Hardin. Jackson could have located the west boundary line only as a result of much work. Appellants show this to be one of Jackson's corners only by general reputation. Jackson made no report calling for that corner. No one testified that Jackson placed the stake there. It has its place in this record only from a showing, as we have said, of general reputation, which goes no further than to show that Jackson tried to find the west boundary line of the league and established this stake as a result of his work. The general reputation is not that the stake was put in the west boundary line as run by Hardin, but as located by Jackson. In their summary of the facts, appellants show that Jackson committed many minor errors in running his line south from the north boundary line, and in his division of the west half into thirds. On this showing, certainly, the presumption cannot arise that Jackson was absolutely accurate in the location of the stake at the Pounds northwest corner. An error of only a few varas in establishing that corner would absolutely destroy appellants' case. Appellants would give dignity to the Pounds corner on the conclusion that it is only 318 varas north from the original corner of the Devers league.

[27, 28] Jackson made no reference to the beginning corner of the league nor to the southeast corner of the Devers league, as called for by Hardin, and certainly no presumption arises that he either looked for or found that corner, especially in the absence of the field notes made by him of the south one-third. Kerr v. State (Tex. Civ. App.) 205 S. W. 477. Had Jackson called for the beginning corner of the league and tied his work to it, we could have indulged the presumption requested by appellants that the post and mound "at the beginning corner

were in existence, and that Jackson knew this location when he set the Pounds stake." In basing their line upon the Pounds corner, appellants would run it north upon the calls of the original grant for course in face of Jackson's work showing a material variation from that call. With this showing of variation from the original calls in 19 years after the original survey was made, we think that appellants rested under the burden of showing that that variation had been corrected so that the original call would be correct, in order to sustain the location claimed by them more than 2 miles from their beginning point, that is, from the Pounds stake to the northwest corner of the league, and to claim an exact location in order to cover the 40 varas in dispute. If Jackson in 1854 could not follow the original course, how could a jury now, in the absence of evidence correcting that variation, locate a line upon the call of the original field notes? The circumstances summarized by appellants do not strengthen in the least the evidence of Mr. Weed that the location of the west boundary line contended for by appellants rests upon the stake at the Pounds corner. The recognition of Weed's line by the land office and by subsequent surveyors, the maps filed and used by the land office, are all the result of Weed's work, and Weed says that his work was tied to the Pounds stake. The same proposition disposes of Thompkin's work. It was based upon the Pounds stake. As we understand appellants' case, every circumstance offered by them to establish their line relates back to the Pounds corner. Since appellants' case depends upon the stake at the Pounds northwest corner, have they shown facts sufficient to take their theory of the case to the jury?

[29] That the location of a line may, under certain circumstances, be shown by general reputation is conceded (Stover v. Gilbert, 112 Tex. 429, 247 S. W. 841); and if the origin of the reputation is unexplained, the presumption is it arose from knowledge of the location of the footsteps of the original surveyor. But here the origin of the presumption was shown, excluding that presumption. The reputation is not that it was Hardin's line, but Jackson's conclusion as to where Hardin's line was located. This stake, then, amounts to no more than a declaration by Jackson that, in subdividing the west half of the league, he did the work with all the errors reflected by appellants' statement, supra, and on his conclusion as to the proper location of the unmarked league line established the Pounds corner. He had no actual knowledge of the location of the west boundary line.

[30-32] In State v. Dayton Lumber Company, supra, it was held that reputation as to the location of the original line originating from a survey made by a surveyor who was not shown to have known of the location of

said line was not admissible. See, also, Goodson v. Fitzgerald, 40 Tex. Civ. App. 619, 90 S. W. 898. That proposition is the law, except where it is the best evidence available. On this exception to the general rule, if the location of the west boundary line rested upon the evidence found on that line, the general reputation of the Pounds corner would be admissible, since it would be the best evidence available, and would sustain the location of the line. As that evidence is in the record, if we disregard all testimony adduced by appellees in whose favor the verdict was instructed, appellants made a case for the jury. They invoke the general rule that in testing an instructed verdict the appellate court must disregard all testimony adduced in favor of the party for whom the verdict was instructed. Kirksey v. Southern Traction Co., 110 Tex. 190, 217 S. W. 139; Guedry v. Jordan (Tex. Civ. App.) 268 S. W. 195. Ordinarily, this rule governs an instructed verdict in a boundary suit. New York & T. Land Co. v. Votaw, 91 Tex. 282, 42 S. W. 969; Lecomte v. Toudouze, 82 Tex. 208, 17 S. W. 1047, 27 Am. St. Rep. 870; Adams v. Crenshaw, 74 Tex. 111, 11 S. W. 1082; Moore v. Stewart (Tex. Sup.) 7 S. W. 771; McCormack v. Crawford (Tex. Civ. App.) 181 S. W. 485; McFaddin v. Vennerson (Tex. Civ. App.) 169 S. W. 1079; Rosenthal v. Sun Company (Tex. Civ. App.) 156 S. W. 513. But this rule has this qualification: If the facts are not in dispute and the only question involved is the correct application to the facts of well-known principles of law, the location of the boundary is a question of law for the court, and a verdict should be instructed; that is, the court cannot weigh the evidence of one party against the other and find that one theory of the evidence is true and the other false, but, conceding the truth of the testimony, must determine its legal effect by the well-known principles of law governing boundary suits. Cameron & Co. v. Taylor (Tex. Civ. App.) 288 S. W. 268. When the court thus weighs the legal effect of the evidence in favor of appellees against that in favor of the appellants, the instructed verdict must be sustained. Contrasting appellees' case with appellants' makes this conclusion irresistible. Appellees would go 2,213 varas. Appellants must go 4,200 varas. In Matador v. Cassidy, supra, it was said: "The greater the distance, the greater the probability of error." Therefore, appellees' call is entitled to the dignity given by the Commission of Appeals in Petty v. Paggi to the least remote of the points. Appellees would run upon a marked line, upon a recognized course, in which there could be no error. Appellants would run upon an uncertain call for course, upon an unmarked line. Appellees would begin at the northeast corner of the west one-half, which was shown without controversy to be in the north boundary line, and which, upon any construction

of the evidence, was fixed by Jackson as a result of an actual survey from the northwest corner. Appellants would begin at the Pounds northwest corner, not shown with any degree of certainty to have been in the west boundary line of the league, and can be placed there only by the verdict of a jury that would reconcile many mistakes made by Jackson in trying to reach that corner. We think these conclusions bring this case peculiarly within the rule reannounced in Finberg v. Gilbert, that if "calls are conflicting and contradictory, then preference must be given to those which, in their application to the grant in question, are more specific and definite, in place of such as are merely general and indefinite or descriptive."

[33] But apart from all that we have said on the proposition that the instructed verdict of the trial court must be sustained, we do not see how appellants, as plaintiffs, can avoid the effect of the general rule reannounced in Guill v. O'Brien, supra:

"Where no marked trees are on the ground identified by the evidence as those of the grant, as in this case, the true boundary must be ascertained by course and distance given in the patent. Luckett v. Scruggs, 73 Tex. 519, 11 S. W. 529."

[34] Admittedly, as we have repeatedly said in this opinion, there is nothing on the ground south of the north boundary line of the league, unless it be on the east boundary line, to locate the steps of the surveyor Hardin. The northwest corner of the league is in dispute. The northeast corner of the league was shown beyond controversy. The location on the ground of the north boundary line was shown beyond controversy. It follows on these facts, as a matter of law, that appellants, as plaintiffs, cannot locate the northwest corner at a point other than 4,426 varas west of the admitted location of the northeast corner. They were the plaintiffs in this case and can recover only upon an affirmative showing of title. That is to say, the burden rested upon them of showing a location of the west boundary line that would leave in existence the tract of land in controversy. The general rules for locating lost lines and corners imposed a burden upon appellants which they have failed to meet. Harkrider v. Gant (Tex. Civ. App.) 167 S. W. 164.

[35] The trial court erred in instructing a verdict against appellants on their claim for improvements made in good faith in developing the land in controversy for oil. It was agreed that appellants expended $20,216.90 for that purpose; that this was a reasonable expense; and that much more than that amount had been realized from the efforts of appellants. In support of their plea of improvements in good faith, appellants offered testimony clearly raising the issue in their favor, that is, that they were not willful tres-

passers and honestly believed that their title was superior to that of appellees, but their testimony showed that they knew of every fact affecting their rights or interest in the land, as well as the rights and interests of the appellee Houston Production Company. On this statement of the evidence, in view of the construction that we have given the entire record, as reflected by our opinion above, appellants' contention of good faith rests upon the sole ground that they honestly misjudged the law. As sustaining the trial court, the appellee Houston Production Company cites Pittsburgh & W. Va. Gas Co. v. Pentress Gas Co., 84 W. Va. 449, 100 S. E. 296, 7 A. L. R. 901, where the court said:

"The defendants contend that they were not willful trespassers, because they honestly believed that their title was superior to that of the plaintiffs. They were cognizant of every fact affecting their rights or interests in the lands, as well as the rights and interests of the plaintiffs, and their contention of good faith rests upon the sole ground that they honestly misjudged the law. They believed that under the law the existing facts, of which they were fully informed, gave them the superior right. * * * Entire good faith, it occurs to us, would have dictated to them that the proper course would be to wait until the controversy had been finally determined before expending large sums of money in drilling upon the land."

[36] In many cases the proposition quoted would be directly in point and would control the disposition of the case, but not in this case. The strip of land in controversy was only 40 varas wide. Regardless of the extent of appellants' rights, whether they were correct in their contention or not, as the land adjacent to them was being developed, unless they had undertaken to develop this strip of land, the oil thereunder could and might have been drilled out, leaving them nothing but barren sand and a naked victory, had they been successful. That being the case, if they honestly believed on all the facts before them that they owned the land and in good faith undertook to develop it, they should be protected to the extent of the expenses incurred, inasmuch as the value of the oil taken from the land vastly exceeds these expenses. In doing so, they have not injured appellees, because development was necessary to bring the oil to the surface. In recompensing appellants, appellees will not be punished, because they are paying appellants only what they would have had to pay out to have the land developed. Of course, if appellants were willful trespassers, the punishment meted out to them by the law is the loss of the cost of their development, but that issue should be decided by the jury.

From what we have said, appellants' motion for rehearing must be overruled and the judgment of the trial court in favor of Houston Production Company awarding it the strip of land in controversy is affirmed; the

judgment against appellants on the issue of improvements is reversed, and the cause, on that issue, remanded for a new trial. All assignments not discussed are overruled, and, except as indicated, the judgment of the trial court is affirmed.

[37] The original opinion of this court affirming the trial court's judgment was filed last term. When appellants filed their motion for rehearing, because of a doubt the court had as to the correctness of its conclusion affirming the trial court's judgment, we certified the issues in controversy to the Supreme Court. Our certificate was dismissed on the ground that the Supreme Court did not have jurisdiction to answer our questions. Taylor v. Higgins Oil & Fuel Co. (Tex. Com. App.) 298 S. W. 891. Thereupon, appellants filed a motion to recertify the case, suggesting one question, which was, in legal effect, absolutely a recertification of question No. 3 of our original certificate. The authorities that condemned that question in our original certificate would make it improper for us to send the case back to the Supreme Court on a new certificate. Therefore the motion to recertify is overruled. Our opinion on original submission is very long, though we discussed only the third proposition of this opinion. On rehearing and in answer to appellees' motion to withdraw our certificate, we wrote an additional opinion of four pages. In our original opinion we were in error, as appellants now concede, in our construction of the Higgins lease. A large part of the original opinion was devoted to facts on that issue. On rehearing it has become necessary, on the insistence of appellee, that we discuss their propositions of estoppel and of the want of title in appellants to prosecute this suit. These propositions would have entailed a third opinion of considerable length. Therefore, that the entire case may be discussed together, we withdraw our two opinions already filed, and substitute this opinion on rehearing as our disposition of the issues involved, so that the Supreme Court may, if it takes jurisdiction, have before it facts sufficient to dispose of the case.